# E. E. CLARK

*v.*

# WILLIAM E. ROBINSON.

1. ELECTION—*ballot not giving full name.* In an election, where there were two candidates for the office of circuit clerk, one of whom was E. E. Clark, a ballot cast for "E. Clark" for clerk of the circuit court, and another for "Clark" for same office, were not counted for "E. E. Clark": *Held*, that they should have been counted for him.

2. SAME—*ballot with names of two candidates for same office.* Where a ballot cast at an election had the name "Clark" written on it, and "W. E. Robinson," printed, with the words "for clerk of the circuit court," erased, it was held right not to count the same for either of the two candidates.

3. SAME — *ballots construed as to name of candidate.* At an election, where there were but two candidates for circuit clerk, E. E. Clark and William E. Robinson, it was *held*, that three votes cast respectively for "W. E. Robso," "Robertson," and "W. E. Robers," for clerk of the circuit court, should be counted for William E. Robinson. And when the name "E. E. Clark," in the printed ballot, was erased, and the word "Robin—" written on the margin of the left of the words "for circuit clerk," with a light mark at the end of the name, a half inch long, it was *held*, that the vote should have been counted for Robinson.

4. SAME—*vote of foreigner not naturalized.* In a contested election, where the proof shows that persons of foreign birth voted who had only made declarations of their intention to become citizens of the United States, it was *held*, that their votes should not be counted.

5. SAME—*right of person to vote—defect of mental powers.* A person who is capable of doing ordinary work, and transacting business, who knows money and its value, makes his own contracts and does his own trading, or a person vacillating and easily persuaded, or a person who has been laboring under some kind of illusion or hallucination, but not so as to incapacitate him for the general management of business, which illusion or hallucination is not shown to extend to political matters, can not be denied the privilege of the elective franchise on the ground of a want of mental capacity.

6. SAME—*proof of qualification of unregistered voter.* The vote of an unregistered voter, received by the judges of election on his affidavit, will not be rejected because the other proof of his qualification was made by a person not a householder and registered voter. The statute in this respect is directory.

7. SAME—*vote presumed to be legal.* The presumption of the legality of a vote in no way depends upon the omission to challenge or object to it, or any presumed knowledge of the judges of election, but it arises from the fact of its having been deposited in the ballot box. When once deposited, it will be presumed to be a legal vote until there is evidence to the contrary.

8. SAME—*delivery of ballot by sick person.* Where a sick person is brought in a carriage to the window of the school house in which an election is held, and reaches out his ballot to one of the judges, who extends his hand through the window, but not being able to reach far enough, a person standing by hands it to the judge, in whose sight it is until received by him, such person's vote can not be rejected on the ground of not having been personally given.

9. SAME—*residence of pauper.* A pauper remaining at the county poor house, and sent there from another township, does not acquire a residence in the township in which the poor house is located, so as to entitle him to vote in the latter township.

10. Persons under legal disability or restraint, persons of non-sane memory, or persons in want of freedom, are incapable of losing or gaining a residence by acts performed by them under the control of others. There must be an act of volition by persons free from restraint and capable of acting for themselves, in order to acquire a change of residence. A person, by being removed from his town to the county poor house in a different town, does not thereby lose his residence in the town from which he came.

11. SAME—*rejection of double ballot.* There is no warrant of law for rejecting a numbered ballot because it is folded with one which is not numbered.

12. SAME—*place of voting—change of towns.* Where the division of a county into townships is shown, by the records of the county, to justify persons residing in one of the towns thus established in voting in an adjoining one, it

must be shown the boundaries of the towns have been changed by the board of supervisors according to law. Proof that such persons were assessed in the adjoining town, paid taxes and worked roads therein, is not sufficient to show a change. If there was no record, such proof, it seems, might be received as evidence of a change, if of sufficient antiquity.

13. SAME—*evidence of identity of voter.* Where a person by the name of Peter Mason voted at an election, and, on a contest of the election, a man of that name was called as a witness, and who showed he was of foreign birth, and had never been naturalized, it was *held,* that, as he was found in the same county, it would be presumed, from the, identity of name, that the witness was the person who voted.

APPEAL from the County Court of Coles county; the Hon. W. E. ADAMS, Judge, presiding.

Mr. O. B. FICKLIN, Mr. A. J. FRYER, and Mr. H. S. CLARK, for the appellant.

Mr. CHARLES BENNETT, for the appellee.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

This was a proceeding commenced by the appellant herein, E. E. Clark, in the county court of Coles county, at the December term, 1876, to contest the election held on the 7th day of November, 1876, in that county, for clerk of the circuit court of the county. The cause was heard by the county court at the July term, 1877, and judgment given against appellant, from which this appeal was taken.

The board of canvassers declared that there were cast for the office, 2943 votes for the appellee, William E. Robinson, and 2927 for appellant, giving a majority of 16 votes for appellee.

In one election district, one ballot was cast for "E. Clark" for clerk of the circuit court, and one other ballot for "Clark" for clerk of the circuit court, neither of which was counted for appellant. Appellee admits that these two ballots were intended to be cast for appellant. They should have been counted for him. *Talkington* v. *Turner,* 71 Ill. 234.

One ballot had "Clark" written on it, and "W. E. Robin-

son," printed, with "for clerk of the circuit court," erased.
It was counted for neither contestant nor defendant.  Appellant claims it should have been counted for him; that the person casting this ballot must have taken the line containing the words "for clerk of the circuit court" for the one containing the words "William E. Robinson," and thus have mistakenly erased the former, instead of the latter.  This may have been so, but it is only matter of conjecture.  There is nothing to show that the voter intended to do any other thing than what he did do, except the appearance of the ballot.  The name of the office is erased, so that two persons appear to be voted for, without designation of the office.  Had not the words "for clerk of the circuit court" been erased, the ballot would have contained two names for the same office.  By § 58, p. 459, Rev. Stat. 1874, if more persons are designated for any office than there are candidates to be elected, such part of the ticket shall not be counted for either of the candidates.  We do not see what could properly be done with such a ballot, except as was done, not to count it for either candidate.

Appellant challenges the four votes of Herbert Kittle, Wm. Harpin, Robert Waller and Ernest Walther, which were counted for appellee, on the ground that these persons were foreign born, and never naturalized as citizens of the United States.  Upon an examination of the evidence, it appears to sustain the objection; it shows that these persons had but made declarations of their intentions to become citizens of the United States, and these votes should not be counted for appellee.

Appellant objects to the five votes of Josh Edington, John Goodwin, Thomas Halbrook, Pont Elkin and George W. Matthews, counted for appellee, that the persons casting them were *non compotes mentis.*

Upon this subject, Judge COOLEY, in his work on Const. Lim. 599, remarks: "In some States, idiots and lunatics are also expressly excluded; and it has been supposed that these unfortunate classes, by the common political law of England

and of this country, were excluded with women, minors and aliens, from exercising the right of suffrage, even though not prohibited therefrom by any express constitutional or statutory provision," citing Cushing's Legislative Assemblies, §§ 24, 27.

There is in this State no express exclusion by constitution or statute. Without further remark upon the legal question, we deem it sufficient to say that we do not regard the testimony as bringing these persons within the description of the above named classes. In regard to Thomas Halbrook, who is most obnoxious to the objection, in the amount of adverse professional testimony, there is the testimony of three witnesses, in whose several employ he had been at different times, that he is a good hand at farm work, and in both saw and grist mills; that he needs no instruction about his work, does the same work and receives the same pay as other hands, knows money and its value, makes his own contracts, does his own trading and takes care of his own money, reads, converses freely, talks and laughs like other men, but owing to some disease he had at some time, his speech is imperfect—yet three medical experts, whose opinions we are urged to accept as conclusive, pronounce him an idiot. They differ, in their ideas of an idiot, from Blackstone. He says: " An idiot, or natural fool, is one that hath had no understanding from his nativity, and therefore is, by law, presumed never likely to attain any." "A man is not an idiot, if he have any glimmering of reason, so that he can tell his parents, his age, or the like common matters." 1 Black. Comm. 302, 303. It is but justice, however, that this testimony should be allowed the benefit of the remark in Taylor on Medical Jurisprudence, 743, "but many medico-legal writers apply the term idiot to one who does manifest capacity to receive instruction, although in a low degree."

The only witness testifying against Pont Elkin is a physician, who says that he does not think Elkin insane, but that he does not think him *compos mentis;* that a man vacillating, easily persuaded to do anything, is not properly *compos mentis.*

The testimony with regard to the others, Edington, Goodwin and Matthews, was to much the same effect as that in respect to Halbrook, as regards mental capacity. The evidence shows that for some years Matthews has, at times, labored under some kind of illusion or hallucination, but not to such an extent as to incapacitate him from the general management of his business. This hallucination does not seem to have at all extended to political matters, and the evidence shows that, on the day of election, he conducted himself with entire propriety. As respects the others, witnesses testify to peculiarities and eccentricities indicative of mental deficiency to some extent, but we can not think that persons possessing the degree of understanding which these are shown to have had, are, on the account of mental incapacity, to be denied the privilege of the exercise of the elective franchise. We can allow to the medical opinions no controlling force, but such weight only as we deem them entitled to in view of the facts in evidence. We find no error in counting these votes for appellee.

It is claimed by appellant that L. D. Hoyt, Joseph Johnson, John H. Harper and A. Tumalt, whose votes were counted for appellee, were minors. As to Tumalt, he will be further remarked upon in another connection. We find the evidence sustains this objection as to Hoyt, but not as to the others. The vote of Hoyt should not be counted for appellee.

It is objected to sixteen votes counted for appellee, that the persons casting them were not registered, and that their affidavits of their qualifications as voters, which were received by the judges of election, were defective in the particular that the persons by whose oaths the affidavits were supported were not registered voters and householders, as it is required by the statute they should be. Some of these persons are shown affirmatively to have been legal voters. As respects the others, there is no evidence upon the subject, whether they were or not legal voters. We think this case must be taken to be covered by the decision in *Dale* v. *Irwin,* 78 Ill. 170, which affirmed the legality of the votes of non-registered voters,

which had been received in that case, although there had been no attempt whatever to furnish the required affidavit and proof, holding that the presumption must be, the votes having been received, that the persons were legal voters. To be sure there is a slight difference in the case here, with some of the voters, in the respect of being challenged, and objections to their voting. It was said, in *Dale* v. *Irwin,* "It does not appear these voters (unregistered ones) were challenged, or any objections made to their voting, and the presumption must be, they were legal voters, and so known to the judges of the election." In the case before us, four of the voters were challenged at the polls, and they attempted to furnish affidavits and proof of their qualification to vote. Four others were required by the judges to furnish like affidavits and proof, and attempted to do so. Two more were told by the judges of election that they were not registered, and they attempted to furnish the affidavits and proof. Six others attempted to furnish such affidavits and proof; all made the required affidavits.

The words of the statute are express, that no vote shall be received at any State election, if the name of the person offering to vote be not on the register, unless such person shall furnish to the judges of the election his affidavit that he is an inhabitant of the district, and entitled to vote therein, and prove, by the oath of a householder and registered voter of the district, that he knows such person to be an inhabitant of the district.

The presumption of the legality of a vote in no way depends upon the omission to challenge or object to it, or any presumed knowledge of the judges of election, but it arises from the fact of the deposition of the ballot in the ballot box. A vote so deposited is presumed to be a legal vote, until there is evidence to the contrary. And there is no exception in the prohibitory words of the statute. The decision in *Dale* v. *Irwin* did not go upon the principle of there being no challenge of the voter, or objection made to his voting, or of presumed

knowledge of the judges of election upon the subject, but upon the ground that the prohibition of the statute in this regard was but directory, against receiving such a vote, and that failure of observance of this direction would not invalidate a vote which had been received by the judges of election as sufficient, and deposited in the ballot box; but, once there, the presumption would be that it was a legal vote, notwithstanding the express prohibitory words of the statute against receiving the vote. We find no error in counting these votes for appellee.

It is objected to the votes of Frank Hamlin, G. W. Peters and James Saunders, that they did not personally deliver their ballots to the judges of election, and that thus their votes were not personally given, but by proxy; and that, in all elections of a public nature, every vote must be personally given. 2 Kent Com. 354, 11th ed. The facts, as shown by the evidence of two judges of election, were, that these voters, being sick, came to the polls in carriages, and, being driven up to the window in the school house where the polls were held, each reached out his ballot to one of the judges of the election, who extended his hand through the window to receive it, and their hands lacking about two feet of meeting, some person standing by took the vote from the voter's hand and passed it to the judge; they testifying that the ballots were in their sight from the time they left the voters' hands till they were deposited in the ballot box.

We consider these votes as having been personally given. The objection is not well taken.

The votes of 64 persons, which were counted for appellee, are assailed on the ground that the voters had no residence or permanent abode in the election district where they voted; or that their residence in the State, county or voting district, was not of sufficient length of time to entitle them to vote. Six persons of this class, John Barrett, John Golliday, Thomas McGill, John Sherman, John Lake and Joseph Daniels, who voted in Ashmore township, were, at the time, paupers at the

county poor house, which is located in Ashmore township. They were all sent there from other townships. None of these had a residence—to constitute which, under our statute, a permanent abode is necessary—in Ashmore township at the time of the election, but were only staying at the poor house there, subject to the will and orders of the local authorities. This we regard as established by the decision of this court in the case of *Town of Freeport* v. *Board of Supervisors*, 41 Ill. 495.

Although the question of residence, in that case, was in regard to a liability for support, we consider the principle of the decision alike applicable to a question of residence under the election law.

In that case, an act of the General Assembly, approved February 8, 1861, had provided, "that each town in the county of Stephenson, from and after the annual meeting of the board of supervisors of said county, (September, 1861,) shall, respectively, pay the expenses of the support of the paupers residing in each town," etc. The county brought suit against the town of Freeport for the support of five paupers in the county poor house, which was in the town of Silver Creek. These persons were residents of the town of Freeport at the time they were sent to the county poor house, and they had been in the poor house for at least two years prior to the time of the passage of the act. The question was, whether, by being sent to the poor house, they lost their residence in the town of Freeport and became residents of the town of Silver Creek, where the poor house was.

It was there laid down, that, as a general rule, persons under legal disability or restraint, persons of non-sane memory, or persons in want of freedom, are incapable of losing or gaining a residence by acts performed by them under the control of others; that there must be an exercise of volition by persons free from restraint, and capable of acting for themselves, in order to acquire a residence, and that no reason was perceived why the maintenance of a pauper at the poor house should form an exception to the rule; that he was placed there by

the officers of the law, and in pursuance of its requirements, and the act could not be said to be voluntary, but was induced by necessity; that so soon as he becomes a charge, and while he remains so, he ceases to be a free agent, but is in the hands, and to a certain extent under the control, of the public officers intrusted with the execution of the poor laws; that persons acting under the legal authority of others do not lose or acquire a residence thereby. And the conclusion was, that by being removed to the county poor house the persons did not lose their residence in the town of Freeport, nor did they gain a settlement in the town of Silver Creek.

We hold that these six votes should not be counted for appellee, the persons casting them not being residents in the election district in which they voted.

We are satisfied, from the evidence, that J. W. Robinson had not resided in the county ninety days; that W. H. Johnson and Benjamin Ainsworth had not resided one year in the State; that James Johnson was not a resident of the State; that N. H. Washburne was not a resident of the county—for which reasons their votes were illegal. They were all counted for appellee, but should not be allowed to him.

There are nine votes of this last class depending entirely upon questions of fact, which we find, from the evidence, to be of quite doubtful legality, viz: those of Thomas Sanders, George Cutler, W. R. Layton, U. T. S. Rice, L. C. Fell, Samuel Lofland, George Lofland, Alexander Daniels, and A. Tumalt. The latter one has been before mentioned as objected to under the class of minors; his vote is also objected to on the score of residence. As, in the final result at which we arrive, it is not material that these nine votes should be counted for appellee, we will give to appellant the benefit of the doubt arising upon them, and not count them for appellee.

As respects all the remainder of the last class of voters, upon a full examination of the evidence pertaining to each individual voter, we can but consider it as insufficient to show that the persons were not legal voters.

It being a mere question of fact upon the evidence, it would be tedious, and as we regard profitless, to enter into a review of the testimony in detail, and we will omit to·do so.

The two votes of N. Fleetwood and Albert Fleetwood, counted for appellee, will be rejected on the ground that they lived on the east side of the Embarras river, and voted illegally in the township of Morgan, the legality of the votes depending on whether that river is the eastern boundary of Morgan township, which will be hereafter considered in connection with objections on that ground to votes for appellant.

Three votes cast, respectively, for " W. E. Robso," " Robertson," and " W. E. Robers," were counted for appellee, to which objection is made. These votes were cast for circuit clerk. The evidence shows that there were no candidates for circuit clerk at the election except appellant and appellee. We can have no doubt, from the evidence, that these three votes were intended for the appellee. " Robso " and " Robers," no doubt, were abbreviations for the name of appellee, and the cause of the abbreviation is apparent from the ballots alone, viz: the words were written on the right hand·margin of the ticket, and running out to the edge, the edge of the paper being reached before the name was finished.

The result of this examination of votes, as claimed for and challenged by appellant, is, that two should be added to the number of his votes, and twenty-seven subtracted from the number of appellee's votes, which would change the balance of the count from sixteen majority in favor of appellee to thirteen majority in favor of appellant.

Appellee, on his part, insists, that one ballot, which contained the name of "Robin—," written on the margin to the left of " for circuit clerk," and with a continuation at the end with a light mark of at least a half inch, and having the name of E. E. Clark erased, should have been counted for appellee, instead of being thrown out, as it. was. We have no doubt that the continuation at the end of this word was designed to represent the residue of the name of the appellee, that the vote

was intended for appellee, and we think it should be counted for him.

James Philson, it was admitted, voted for appellee in Mattoon, district 1. His ballot, No. 232, could not be found among the ballots of that district. It was proved that in that district one ballot, containing the name of appellee, was destroyed by the judges of election and not counted for him, for the reason that it was folded together with another ballot, not numbered. The number of ballots returned by the judges was one less than shown by the poll books. The unavoidable conclusion is, that the ballot destroyed was that of Philson. Question is made, on the ground of residence, whether Philson was a legal voter in that district in which he voted. We consider the evidence as showing that he was, and that there should be one added to appellee's vote to give him the benefit of this Philson vote, which was cast but not counted for him. We know of no warrant for the rejection of a numbered ballot because folded with an unnumbered one.

Nine voters, viz: Wm. Golliday, Jerry McKinney, T. J. Eaton, R. L. Tremble, John McKinney, John Palmer, Byrd Palmer, Jasper Michaels, and William W. Wiley, resided on the east side of the Embarras river, and in what appellee claims to be Oakland township, and voted on the west side of that river, in what appellee claims to be Morgan township; and two voters, W. H. Larimer and Henry Bolen, who resided on the west side of that river and in what appellee claims to be Morgan township, voted on the east side of that river, in what appellee claims to be Ashmore township.

These eleven votes were cast and counted for appellant, and they are challenged by appellee as having been illegally cast in the election districts they were, on the ground that the voters did not reside in such districts. The only question involved in these cases is, whether the Embarras river is the boundary line between Morgan township on the west side of the river, and Oakland and Ashmore townships on the east side of it.

The records of the county court of Coles county show, that at the September term, 1859, of that court, proceedings were instituted, in accordance with the statute, to adopt township organization, and to divide the county into towns. A petition being presented, as required by the statute, the question was ordered to be submitted to the legal voters of the county. There being a majority of votes for township organization, three commissioners were appointed at the December term of the court to divide the county into townships. The commissioners discharged their duty, and the record of their report is in evidence. It is in the same book containing the record of the other proceedings, between the March term, 1860, of the county court, which, from that time, ceased to have charge of county affairs, and the May term, 1860, of the board of supervisors, which succeeded the county court, that being their first meeting.

Sec. 8, of the Township Organization act, requires the commissioners to make and file with the county clerk a written report of their proceedings, giving the names and bounds of each town. Sec. 9 of the act requires the county clerk to record, in a book kept for that purpose, the report of the commissioners. He is also required to transmit to the Auditor of Public Accounts of the State an abstract of such report, giving the bounds of each town, and the name designated. And by sec. 11 of the act, the Auditor is required to keep a record of the names and boundaries of the several towns. At the May term, 1860, of the board of supervisors, on information from the Auditor, they changed the names of four of the towns, and at the same term the commissioners were ordered to be paid for their services in dividing the county into towns. The evidence shows there to be no other records in the office of the clerk pertaining to the subject than the foregoing. The general course of Embarras river is from the north to the south—up river being north.

The description of Ashmore township, in the recorded report of the commissioners, shows distinctly that the centre of the

Embarras river formed its entire western boundary. Larimer
and Bolen then, residing on the west side of that river, could
not be residents of Ashmore township. The description of
Morgan township shows that the centre of the Embarras river
forms its entire eastern boundary, from its south-east corner,
where the township line dividing towns 12 and 13 north,
range 10 east, crosses the river, up to the point where said
river strikes the line dividing sections 22 and 23, town 14
north, range 10 east. It is admitted that the nine persons
above mentioned resided south of said sections 22 and 23, and
on the east side of said river, so that they could not have lived
in Morgan township, where they voted.

There can be no doubt of the due establishment of the
boundary lines of said towns, and to justify the reception of
these votes, it is incumbent upon appellee to show that there
has been an alteration of the boundary line. The change of
boundary lines is provided for by § 26 of the act aforesaid.
It is to be done by the board of supervisors of the county after
giving the prescribed notice by the posting up of notices, and
publication of the notice in a newspaper of the county, if there
be one. No attempt is made to prove any action of the county
board in this respect. But much evidence is introduced to the
effect, that these persons believed they lived in the townships
in which they voted; that they were registered as voters in
such townships; that for a number of years they had voted,
been assessed on both personal and real property, paid their
taxes, worked the roads after being warned by the road over-
seers, as belonging to such townships.

It is not permitted to land owners and tax payers, living
along the line of townships, to change township lines once
legally established and made matter of record; nor are asses-
sors, collectors, overseers of highways, or judges of election
vested with such power. It is only the board of supervisors
of the county who can make the alteration after giving the
prescribed formal notice thereof for the required length of time.

The evidence adduced is insufficient to show that there has been any alteration of the boundary lines.

Had there been no record, or other direct evidence of the establishment of the boundary lines, then such evidence as that above might have been competent, as showing where was the boundary line, or there might perhaps have been a user and reputation for such a length of time as to have warranted a presumption that the board of supervisors had, in accordance with the statute, duly made an alteration of the boundary; but there is not enough of antiquity belonging to the subject to afford foundation for any presumption of this sort.

We find that these eleven votes were not cast in the election district where the voters resided, and that they should not be counted for appellant. It was upon the decision of this question that the votes of the two Fleetwoods for appellee were above rejected.

Appellee objects to several votes counted for appellant, that the persons casting them were foreign born and never naturalized. The evidence clearly shows this to be so, as respects Peter Mason and Augustus Guyett. The latter name appears on the poll book, Augustine Guyott, but this we regard as of no consequence, the names doubtless representing one and the same man.

It is answered as to Mason, that there is evidence that *a* Peter Mason was foreign born and never naturalized; but that there is no evidence going to show that he was the Peter Mason who voted. All the evidence is that of the witness himself, Peter Mason, who merely testifies, that he was born in Canada, had never taken out naturalization papers since he came to the United States, and that his parents were citizens of Canada. The witness Peter Mason being found and examined as a witness in the county where the vote was cast, we think he must be taken to be the same person who voted, whose name appears upon the poll book as Peter Mason; that identity of name is here presumptive evidence of identity of person. The like point is made against some other votes, and we deem

it not well taken. These two votes should not be counted for appellant.

Appellee has challenged a large number of votes cast and counted for appellant, on account of insufficient residence of the persons casting them, as did the appellant, many of them being similar cases.

Of this number, we find the evidence to show clearly that Berry Creel and Benjamin H. Barnett had not resided in the county ninety days next preceding the election; and that D. M. Woods and Charles Birch had not resided in the State one year. These four votes were illegal and should not be counted for appellant. We need to go no further for the determination of this case.

This examination, on the side of appellee, shows that two should be added to the number of votes counted for appellee, and seventeen should be subtracted from the number of votes counted for appellant. This overcomes and reverses the majority of thirteen, which appeared in favor of appellant from the examination on his claim and challenge of votes alone, and leaves, as the result of our finding upon the entire count of the votes, a majority of six in favor of the appellee.

The judgment will therefore be affirmed.

*Judgment affirmed.*