(No. 21134

James V. Stevenson, Appellee, *vs.* Clayton Baker, Appellant.

*Opinion filed February 19, 1932.*

ARTHUR H. SHAY, for appellant.

DUNCAN & O'CONOR, and HIBBS & POOL, for appellee.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Appellant, Clayton Baker, a candidate on the Independent ticket, and appellee, James V. Stevenson, a candidate on the Republican ticket, were opposing candidates for the office of supervisor of the town of Otter Creek, LaSalle county, at an election held in that township April 7, 1931. The canvass of the votes showed that appellant had received 259 votes and that appellee had received 258 votes for that office. Appellee on May 1, 1931, filed in the county court of said county a petition to contest the election. An answer was filed by appellant, and after a hearing judgment was entered in favor of appellee, from which judgment this appeal is prosecuted.

There were two precincts in the town of Otter Creek. The returns of the election in the first precinct showed that appellee received 110 votes and that appellant received 89 votes. The total of all the ballots returned in that precinct was 206. There were two ballots returned as spoiled ballots, and it was stipulated in the lower court that another ballot cast in that precinct should not be counted for either

candidate. There were four other ballots, marked for identification as 5A, 5B, 5C and 5D, that were not counted by the judges of the election of that precinct for either of the candidates. These seven ballots specified were the only ballots in that precinct that were not counted by the election judges as legal votes.

After the ballots had been opened in the county court it was stipulated that of the ballots cast in the first precinct 108 should be counted for appellee and 87 for appellant. One other ballot cast in that precinct was counted by the court for appellee and three others were counted for appellant, and there are no assignments of error by either appellee or appellant that question the correctness of the count of any one of those four ballots. Of the four ballots marked for identification, 5A, 5B and 5D were counted by the court for appellee and 5C was counted for appellant. Appellant's objection to the counting of ballots 5A, 5B, 5C and 5D was that the evidence did not show that those ballots had been so preserved that they were in the same condition as they were when cast. The judges and clerks of election in the first precinct completed their count of the ballots and made and signed their returns and sealed the ballots in envelopes. The four ballots in question, not having been counted for either candidate for supervisor, were placed in a separate envelope, which was marked "objected to," and sealed. Thereafter word came of the result of the election in the second precinct, and one of the judges in the first precinct, Arla Harber, contended and insisted that the envelope marked "objected to" be opened and ballot 5A counted as a vote for appellee. Over the objection of one of the judges, Lester Gochanour, the envelope was opened by judge Arla Harber and ballot 5A was taken out of the envelope and inspected by the judges of that precinct, all of whom were present. There were a number of other people present, including appellee. After considerable discussion it was decided not to count any

one of the four ballots that had been in the envelope marked "objected to," and the four ballots were again sealed in the envelope in the presence of all the judges and clerks of the election in the first precinct. They were preserved with the other ballots and no question is raised by appellant as to the sufficiency of the proof that they were properly preserved from the time they were re-sealed to the time the ballots were all opened in court for a re-count. The testimony of Arla Harber and Anna Lucas, two of the judges of election in the first precinct, and of Alvin Riss and Bertha Chatham, two of the clerks of election in that precinct, who were called as witnesses for appellee, was to the effect that when Mrs. Harber opened the envelope containing the four ballots after it had been once sealed, she took from it only one ballot, ballot 5A; that that ballot was inspected by the judges of election but was handled by no one other than the election officials; that the ballot was then replaced, unchanged, in the envelope for the second time and it was again sealed. Lester Gochanour, the third judge of election in the first precinct, testified as a witness for appellant that when Mrs. Harber opened the envelope containing the four ballots she took out all of those ballots and laid them on the table; that ballot 5A, about which there was a discussion, was passed around and inspected not only by the election officials but by the bystanders before it was returned to the envelope. This witness was shown ballot 5A, and he stated that it was the ballot about which the discussion centered, and said: "I would think that the ballot is the same now as when it was taken out of the box; I would say it is in the same condition; I don't see anything different in the ballot, and I would say it is the same." The testimony of all the judges of election is to the effect that they believed that all four of the ballots were in the same condition that they were when removed from the ballot-box. As contended by appellant, no election judge of that precinct had any right or authority to break open the sealed

envelope containing those ballots over the protest of any one of the judges. The duties of the judges and clerks were ended when they completed their count and finished and signed their tally-list and sealed the ballots and tally-list and poll-books, except to deliver all the packages to the proper custodian. It is conceded by appellant that no one testified that any of the four ballots were tampered with, and that no one testified that there is any difference between the four ballots as exhibited in court, and that the evidence of all the judges of that precinct shows that the ballots when counted in court were in the same condition as when they were removed from the ballot-box. The law is, as stated by appellant, that the burden is on the petitioner in an election contest to show that the ballots counted in the contest were those cast at the election and that they were in the same condition as when cast. (*Clarke* v. *Bettenhausen,* 296 Ill. 373; *Rottner* v. *Buchner,* 260 id. 475.) The finding of the county court that the proof showed that ballots 5A, 5B, 5C and 5D had been preserved so that there was no reasonable opportunity for tampering with them is supported by the evidence in the record, and we hold that there was no error in counting those ballots. They were counted by the court as it was agreed that they should be counted if the proof of their preservation was sufficient.

The court found that Leslie Baker and Mary Baker were not legal voters in the first precinct and that they voted therein for appellant, and deducted two votes from the count for appellant. Two other votes were deducted from the count for appellee by the court, the same being the votes of John Voigts and Mary Voigts. The court found that the Voigts were not legal voters in the first precinct and that they voted for appellee.

Leslie Baker was a cousin of appellant. He and his wife, Mary Baker, lived on a small farm in Otter Creek township for many years. About four years before the

election in question he sold his farm to Ralph Harber and thereafter lived on the farm as a tenant of Harber until March 1, 1931. On or about that date he and his wife moved with all their personal property from this farm to a farm across the line in Livingston county, where they resided up to and including April 7, the date of the election. When workers for appellee at the election brought John Voigts and Mary Voigts, his wife, to the polling place in the first precinct, Charles Riss, a worker at the election for appellant, told Floyd Harber, a worker for appellee, that if the Voigts voted he would bring the Bakers to vote. Thereafter a worker for appellant drove his automobile to the home of the Bakers, in Livingston county, and brought them to the polling place in the first precinct, where they voted. Both Leslie Baker and Mary Baker were called as witnesses by appellant, and they testified that they voted at the election for appellee. They testified that they lived in Livingston county and had lived there since about March 5, 1931. Mary Baker testified: "After we moved to Livingston county I intended to hold my voting place in the town of Otter Creek for this one election and after that find out where we were supposed to vote. I thought I couldn't be deprived of my vote. I couldn't vote in Livingston county and I thought I could vote in Otter Creek." Leslie Baker testified: "When I left Otter Creek township I intended to retain that township as my voting place, as long as I could not vote in Livingston county." The finding of the county court that the Bakers were not qualified voters in Otter Creek township on the day of the election is supported by the evidence in this record and cannot be held to be erroneous. After they abandoned their home in that township and took up their residence in Livingston county they had no right to vote in Otter Creek township. This court stated in *Kreitz* v. *Behrensmeyer,* 125 Ill. 141, that "it does not follow because a man must have a domicile somewhere and that a domicile once gained remains

until a new one is acquired, that a man must be entitled to vote somewhere, or that the right to vote at a particular poll being once established is presumed to continue until the right to vote elsewhere is shown." When a voter of this State changes his residence and establishes his domicile in another county of this State he loses his right to vote in the precinct and in the county from which he moved. The finding of the county court that the Bakers voted for appellant is contrary to their testimony that they voted for appellee but is supported by the evidence in the record. The finding, as shown by the written decision of the trial judge, is based not only upon the positive evidence in the record, but also upon the behavior, demeanor, conduct and attitude of the Bakers while on the witness stand, and also upon the fact that they contradicted each other in material matters testified to by them and were also likewise contradicted by other testimony in the record. The record shows that both those witnesses were informed by the court, at the request of counsel for appellee, that it was not compulsory for them to tell for whom they voted in the election if they personally objected to doing so. On receiving this information Mary Baker replied in these words: "As far as my voting is concerned, I don't care who knows that I voted for Mr. Stevenson; it don't make no difference to me." Leslie Baker's reply to the information by the court was, "It don't make much difference to me." He then testified very willingly that he voted for James V. Stevenson. The record also shows that Mary Baker testified before her husband did and that he heard all of her testimony. He not only contradicted her in many important particulars but his own testimony is very inconsistent and contradictory in material matters. We have read all their testimony in the record just as it was given to the court, and the court's conclusions that these witnesses were partisan witnesses for appellant and that their testimony was unreasonable and unreliable are war-

ranted by the evidence in the record, and we would not be justified in holding otherwise.

John Voigts was born in Otter Creek township and prior to March, 1931, had lived for many years with his wife and family on a farm of 120 acres in section 10 in that township. In February, 1931, he sold that farm and on March 17, 1931, moved therefrom with his family and personal property to a farm in Allen township that he had bought with the proceeds of the sale of his 120-acre farm in Otter Creek township. He had prior to his removal to Allen township a contract to purchase an 80-acre farm in Otter Creek township, in section 14, and after his removal to Allen township kept some personal property and carried on farming operations there, but he never lived on this farm and the dwelling house thereon was leased to a tenant. While he, as a witness for appellee in rebuttal, testified that he wanted and intended to retain the right to vote in Otter Creek township, he admitted on cross-examination that he had stated that he moved to Allen township with the intention of making it his home. He and his wife, Mary Voigts, voted in the first precinct in Otter Creek township at the election on April 7, 1931, and the evidence showed that they voted for appellee. The finding of the court that their votes were illegal and were cast for appellee is sustained by the evidence and cannot be held erroneous.

The testimony of Sylvester Benckendorf on the points upon which we are to determine whether or not he was a legal voter at the election is in substance as follows: He was registered as a legal voter in the first precinct of Otter Creek township on the day of the election and had been so registered since he was twenty-one years of age, had voted several times in that precinct prior to said election and had never voted elsewhere. He was born in the town of Otter Creek, was twenty-five years of age and had lived with his father up to the time he married. He married nearly two years ago, and he and his wife have been living with

his father-in-law, Nicholas Krebbs, and paying him for his board, since they married. Since they were married all the personal property that they have owned was a radio, which they bought and kept at their father-in-law's, a lot of dishes which were presented to them as wedding presents, and two sitting-room chairs which they bought after they were married. They kept the dishes and chairs a short while at his father-in-law's home and then moved them and stored them in his father's home. His father and mother do not use them. He and his wife stayed a part of their time after they were married and before the election at his father's home, and during that time they did not pay his father-in-law board, and he did not pay board at his father's place when visiting there but during that time he worked for his father on his father's farm and did sufficient work to compensate his· father for his board. They visited his father quite often in the Fall of 1930 and sometimes would stay for three nights at a time, and twice during that time they were there for more than three nights, and one time were there only one night. From the time he went to his father-in-law's to stay, to the present time, his wife's home has been with "her father and mother." When asked what was his intention as to his legal residence on April 7, 1931, he answered, "I always figured that I would probably move back out in the country again." When the same question was repeated to him as to where his legal residence was on election day, he answered: "Out in the country, I guess; I was just paying board in town." He further explained that he meant by his words, "out in the country," in Otter Creek township. He said that he did not own a home. When he voted April 7 he and his wife were staying with his father-in-law in the city of Streator, in Bruce township, in LaSalle county. When he and his wife first went to his father-in-law's residence to stay his father-in-law lived in Livingston county, and he and his wife and his father-in-law later moved to Streator, in Bruce

township, and while living there he made a return of the personal property owned by him for taxes to the assessor of the town of Bruce. He at no time made a return of personal property owned by him for taxes to the assessor of the town of Otter Creek. While staying at his father-in-law's he worked on the Prairie pipe line as a truck driver, hauling equipment, repairs and men for that pipe line company. That company has a small office at Kernan, in Otter Creek township, and it has a stock room there in which it keeps its supplies. The territory that he covered on that pipe line is between Chicago Heights and Galesburg, and sometimes he would be gone over night. He kept his truck that he drove in the garage of the pipe line company, about seven miles from his father-in-law's residence. He drove his car from the pipe line company, when his day's work ended, to his home at his father-in-law's and kept it "in the garage at home" on the Krebbs place, and from his home he drove his car to the Prairie pipe line for work next day. He had worked at that job "not quite two years," and is still holding the job and still stays with Krebbs and intends to hold it until he is "fired," and that has been his intention all the time. He has not been notified that he would be discharged. When asked by appellant's counsel for whom he voted in the election, and the further question if he favored James V. Stevenson, at the request of counsel for appellee he was informed by the court that he could refuse to answer those questions if he so desired, and answered that he would not answer them, and he did not answer them. He did testify that his father, Fred Benckendorf, and his brothers living in Otter Creek township, were actively supporting Stevenson for supervisor in that election. Lloyd Gochanour, a witness for appellant, testified to the effect that Benckendorf was supporting Stevenson for supervisor and that he told witness so on the day before the election; that he also told witness that he was going to the election the next day to vote for Ste-

venson. Appellant contended in the lower court, and contends in this court, that Benckendorf and Roy Reese were both illegal voters and voted for appellee at the election, and that their votes should be deducted from the count for appellee in the first precinct. The court held that the evidence did not show that said voters were not qualified voters and that it did not show for whom they voted, and counted both votes for appellee.

The evidence for appellant that Reese was not a legal voter in the first precinct was given by the witness Norval Galloway, of Streator, to the effect that on April 7, 1931, Reese lived at the home of his mother in Streator and had lived there since February, 1931. He further testified that he had talked with Reese since the election and told him that he thought he voted for Stevenson, and that Reese replied, "Well, you are a good guesser." Reese testified in rebuttal that on the date of the election he was an unmarried man of the age of twenty-two years and had been a registered voter in Otter Creek township since 1929 and had never voted in any other place; that he wanted to maintain a voting place in Kernan, in Otter Creek township; that he had worked in that township for various people and had worked at the pumping station at Kernan; that he went alone to the polls to vote on April 7, 1931; that his mother lived in Streator, and that he had at times stayed at her home during the last two years and was staying there in February, 1931, and continuously thereafter until the election on April 7, and paid his mother for his board. He stated on cross-examination that he had never told anyone that he was making his home with his mother at Streator but that he did say that he was staying there at the time he voted at the election. He also stated that he did not think that he told Arthur Shay, appellant's attorney, that on April 7 his home was with his mother in Streator and that he had been living there and making that place his home since February, 1931. The evidence does not defi-

nitely show from Reese's testimony that his home was with his mother on election day and it does not definitely show that his home was at any certain place in Otter Creek township. He also stated that he would not swear that he told appellee how he voted, but he did state that appellee told him that he did not have to tell how he voted. He also stated that he did not know appellant at the time of the election. The presumption is that the vote cast by Reese was legal, (*Clark* v. *Robinson*, 88 Ill. 498; *Flowers* v. *Kellar*, 322 id. 265;) and the burden was on appellant to show the contrary. The finding of the county court that the evidence did not establish that the vote of Reese was illegal is not manifestly against the weight of the evidence and the court did not err in so finding. The evidence did not overcome the presumption that his domicile was situated in the first precinct. It does show that he voted for appellee.

The court found that of the legal votes cast in the first precinct appellee received a total of 110 votes and appellant 89 votes.

Of the ballots cast in the second precinct it was stipulated in the lower court that 142 votes should be counted for appellee and 158 should be counted for appellant. Eight other ballots cast in that precinct were counted by the court for appellant and five other ballots were counted by the court for appellee, and there is no assignment of error or cross-error concerning the counting by the court of those ballots.

Mary Gutek voted at the election in the second precinct, and the evidence shows that she had not reached the age of twenty-one years on the day of the election. The county court found that it was impossible to tell from the evidence for whom she voted and therefore disposed of her illegal vote by deducting .47 of the vote from the count for appellee and .53 from the count for appellant, in accordance with the rule approved in *Flowers* v. *Kellar, supra,* and *Choisser* v. *York,* 211 Ill. 56. It is the contention of appellant that the court should have deducted one vote from the

count for appellee on account of this vote. Appellee by his assignment of cross-error says that the court erred in not deducting one vote from the count for appellant on account of this vote. Mrs. Gutek is a niece of Mike Kavinsky, who was a worker for appellant at the election. She testified as a witness for appellant that she rode to the polls on election day with Steve Kmetz and that no other person rode in the car with her except her brother. Clara Elias, a witness for appellee, testified that Mrs. Gutek rode to the election polls in the second precinct with George Mosley, a worker for appellant, and that her husband and the two Kolischan boys rode in the same car with her. Mrs. Gutek testified that she knew George Mosley and that she did not ride with him to the polls and that he was not in the car in which she rode to the polls; that she knew Albert Kolischan and John Kolischan, referred to by the testimony of Mrs. Elias, and they did not ride to the polls with her and that she did not see them at the polls when she voted. No one of the parties, Steve Kmetz, her brother, George Mosley, Albert Kolischan or John Kolischan, was called as a witness to corroborate her testimony or to contradict Mrs. Elias' statement. Mrs. Gutek was not registered as a voter in that precinct. She admitted that she was not twenty-one years of age on the day she voted and that she then knew that she was under the age of twenty-one years. She admitted that she signed and swore to an affidavit in order to get to vote on that day and that the affidavit was read over to her by the officer who swore her to it before she signed it and that it was recited in the affidavit that she was of the age of twenty-one years. A worker for appellant executed the supporting affidavit. Before she came to the polls appellee had told two of the judges of the second precinct that she was not twenty-one years of age. The county court was not bound to accept the statement of this witness as to how her vote was cast as the truth. (*Widmayer* v. *Davis,* 231 Ill. 42.) The circum-

stantial evidence tended to show that her vote was cast for appellant, and she was contradicted by Mrs. Elias, an unimpeached witness, who testified to a substantial part of the circumstances tending to show that her vote was cast for appellant. We cannot hold that the court committed any error in not finding that she voted for appellee. We have read and considered all of her evidence as it is found in the record and are of the opinion that the county court would have been justified in deducting a full vote from the count for appellant, although we will not hold that it committed error in deducting part of Mrs. Gutek's vote from appellee and a part thereof from appellant.

Four ballots marked for appellant and one ballot marked for appellee which were cast in the second precinct were rejected because they had distinguishing marks on them. Appellant has assigned error on the action of the county court in rejecting the four ballots marked for him, which are ballots 27, 28, 29 and 30. Ballot 27 has a cross made by diagonal lines in the square in front of the name of appellant on the face of the ballot, and also has on the back of the ballot, between the printed matter and the edge of the ballot, a distinct cross made by diagonal lines, and underneath that cross a short, distinct diagonal line of about the same length as each of the lines used in making the cross. Ballot 28 is marked on the face with a cross made by diagonal lines in the square in front of appellant's name and also a distinct cross of diagonal lines following his name. Ballot 29 is marked on the face with a cross made by one perpendicular and one horizontal line in the square in front of appellant's name. On the back of the ballot, near its edge and between its edge and the printed matter on the back of the ballot, there is a distinct cross very similar to the one in the square in front of appellant's name on the face of the ballot. Ballot 30 is marked on the face with a cross of a perpendicular and a horizontal line in the square in front of appellant's name, and it has on

the back, underneath the *fac simile* signature of the town clerk and before the printed words, "Town Clerk," underneath that signature, a small, distinct cross made by a perpendicular and a horizontal line. The mark on each of those ballots, other than the one in the square in front of the name of appellant, appears to have been made deliberately and cannot be said to have been made by the voter through inadvertence. The decisions of this court hold that any deliberate marking of a ballot by a voter that is not made in an attempt to indicate his choice of candidates, and which is also effective as a mark by which his ballot may be identified, should be considered as a distinguishing mark. (*Isenburg* v. *Martin,* 293 Ill. 408; *Hodgson* v. *Knoblauch,* 268 id. 315; *Brents* v. *Smith,* 250 id. 521; *Arnold* v. *Keil,* 252 id. 340; *Winn* v. *Blackman,* 229 id. 198.) Appellee introduced evidence which showed that some time before the polls in the second precinct were closed the judges and clerks ran out of ballots; that two men, a worker for appellee and a worker for appellant, were sent to the polling place in the first precinct to get more ballots; that they went there and got thirty ballots, which they delivered to the judges of election of the second precinct about five minutes before time for the closing of the polls; that several people were waiting to vote, and that these ballots were indorsed with the initials of a judge and hurriedly passed out to persons waiting to vote. Appellant argues that the marks held by the county court to be distinguishing marks on ballots 27, 28, 29 and 30 may have been placed thereon by someone at the first precinct or by one of the men who brought the thirty ballots from the first to the second precinct. There is no showing, of course, as to when or by whom the four ballots were cast. They may or may not have been of the thirty brought to the second precinct from the first precinct. The testimony of the judge of election of the second precinct who placed his initials on the ballots, while not positive to that effect, tends

to the conclusion that there were no marks on any of the ballots when they were passed out to the voters. The nature of the mark on each of ballots 27, 28, 29 and 30, other than the one indicating the choice of candidates by the voter, supports the conclusion that it was placed there by the voter. The mark on each ballot was not placed there to indicate the voter's choice of candidates and is effective as a mark by which the ballot may be distinguished. The county court did not err in rejecting and refusing to count ballots 27, 28, 29 and 30. No complaint is made by appellee of the action of the court in refusing to count the fifth ballot for him on the ground that it had a distinguishing mark on it.

The county court found that the votes in the second precinct should be counted 146.53 votes for appellee and 165.47 votes for appellant. The court also found that the total vote in both precincts showed 256.53 legal votes cast for appellee and 254.47 legal votes cast for appellant. We find that the court erred in its findings that the evidence showed that Sylvester Benckendorf was a legal voter in the first precinct and that it did not show how he voted. The court also erred in counting Benckendorf's vote for appellee and in not deducting his vote from the vote of appellee. We also hold that the court erred in its holdings that it was optional with Benckendorf, Mary Gutek, Mary Baker and Leslie Baker, all of whom we find from the evidence to be illegal voters, to testify how they voted in the election. A legal voter cannot be compelled, under our law, to testify for whom he voted. (*Eggers* v. *Fox,* 177 Ill. 185.) An illegal voter cannot be compelled to testify that he voted if he claims the personal privilege of refusing to testify on the ground that he would incriminate himself. (*Sorensen* v. *Sorensen,* 189 Ill. 179.) If an illegal voter testifies, without objection, that he attended the election in question and voted he cannot rightfully decline to answer for whom he has voted. In such case the witness must

claim his personal privilege. Neither party to an election contest can claim it for him. (*Buckingham* v. *Angell,* 238 Ill. 564.) After the marriage of a woman, and so long as the relations between her and her husband are not adverse, his residence will be her residence and will change with his throughout their married life. (*Cooper* v. *Beers,* 143 Ill. 25.) Under the same circumstances the husband's domicile will also be his wife's domicile. It is a well known fact that a resident and citizen of this State is required to list personal chattels for taxation in the county in which he resides. Benckendorf's wife's home was therefore his home.

Under our holdings the court should have found that of the legal votes cast in the two precincts appellee received 255.53 and appellant 254.47, and that appellee was elected as supervisor of the town of Otter Creek.

The finding and judgment of the court that appellee was elected to the office of supervisor are affirmed.

*Judgment affirmed.*