591:24 LRA 61
30 LRA 230
32 LRA 658

# CHARLES F. A. BEHRENSMEYER

*v.*

# JOHN B. KREITZ.

*Filed at Springfield January 21, 1891.*

135  591
147  520

135  591
149  501

135  591
161  324
52a  293

135  591
158  616

135  591
177  262
177  356

135  591
87a  115

135  591
189  13  44
189  5  45
189  7  46
189  21  46
189  21  47

135  591
192  48 319

135  591
100a 26  95
100a 26  97

135  591
206  8  84
206  3  98

1. ELECTIONS— *contest of election—of the petition—sufficiency.* A petition in a contest of an election for the office of county treasurer, in regard to illegal votes alleged to have been cast for the defendant, stated that two persons named, of different election districts, who were not legal voters, voted for the defendant; that at another district the persons voted illegally for the defendant, "and that at some of the precincts and districts of said Adams county other illegal votes than those above named were cast by persons not legal voters, for the defendant, for said office of treasurer, and counted by the election judges for him :" *Held,* that the allegation as to "other illegal votes" was too general, and would have been bad on demurrer, but by answering, and denying such allegation, the defendant waived the objection to the defect.

2. The words "other illegal votes," plainly signify illegal votes different from those already specified in the petition, and additional to them ; and such illegal votes may be shown, though cast at the election districts particularly named.

3. SAME—*irregularities—whether ground for rejection of entire poll.* The provisions of the statute as to the manner of conducting the details of an election are not mandatory, but directory, merely, and irregularities in conducting an election and counting the votes, not proceeding from any wrongful intent, and which deprive no legal voter of his vote, and do not change the result, will not vitiate the election, or justify the rejection of the entire poll of a precinct.

4. At a polling place one of the judges of election made at least ten mistakes in numbering the ballots, but the evidence showed it was purely accidental, and from a lack of memory. The election officers, after the close of the polls, took the ballots to a room other than that in which the election was held, and there canvassed the votes. There were other similar irregularities, none of which appeared in any manner to affect the result, and there was no proof of fraud: *Held,* that these irregularities did not justify the rejection of the entire vote cast, on a contest of the election.

5. SAME—*citizenship—right to vote—under constitution of 1848.* A person alien born, who was never naturalized, but a resident of this State at the adoption of the constitution of 1848, though under twenty-one years of age on April 1, 1848, is not entitled to vote in this State under the constitution of 1870.

6. SAME—*being drafted into the army—does not confer citizenship.* The fact that one of alien birth was wrongfully drafted into the army during the late war, and furnished a substitute, does not constitute him a legal voter or make him a citizen.

7. SAME—*evidence of right to vote — declarations of the voter.* The declarations of voters, for the purpose of showing they are not qualified to vote, if made after voting, are inadmissible, but if made at or prior to the election they are competent testimony,—and this though not accompanied by any act.

8. SAME— *burden of proof on question of citizenship.* Where one assumes to prove that another person is not a citizen of this State, the burden of proving a negative is necessarily imposed on him who raises the question of citizenship. The one so questioning the right is not required to produce full and conclusive proof, but is only bound to introduce such proof as renders the existence of the negative probable, and when that is done it is deemed sufficient to shift the burden of proof to the opposite party.

9. So where the proof shows that a person was born in Prussia, and emigrated to this country after reaching manhood, this will be sufficient, *prima facie,* to show alienage, and to shift the burden of showing citizenship upon the party asserting it. If such person was of American parentage, though born abroad, that fact should be shown by him.

10. SAME—*naturalization—must apply in open court.* Naturalization papers issued to an alien by the clerk of a court without any order of court, and when it is shown that the alien never applied for them in open court, as required by law, are void, and confer no right to vote. And naturalization papers issued by a justice of the peace are also void.

11. SAME—*naturalization of the father—as affecting the status of the son.* In order that the naturalization of a parent shall be effective to invest his son with citizenship, two conditions must exist at the time of such naturalization, viz.: the child must be under twenty-one years of age, and must also dwell in the United States.

12. SAME—*and of a step-father—effect of his naturalization.* A person born in Germany was brought to this country by his mother in 1854, he then being about one year old. His mother was married to K., also of foreign birth, in 1854, who procured naturalization papers in 1858 : *Held,* that this naturalized the step-son of K., under the act of Congress of February 10, 1885.

13. SAME—*presumption—that the father was naturalized —from the son having voted.* Mere proof that a person of foreign birth came to this country with his parents, and that he himself has not been naturalized, is not sufficient to overcome the presumption of such person's right to vote, arising from his having voted. In such case it will be presumed that the voter's father was naturalized.

14. SAME—*burden of proof—to show the naturalization of the father.* If a person of foreign birth claims the right to vote on the ground of his father's naturalization, he will not be required to show such naturalization until the strong presumption that he has voted legally and has not committed a crime is rebutted by the introduction of evidence tending to show the father was not naturalized.

15. SAME—*naturalization of the father—circumstances to exclude the presumption.* A person voting at an election was only two and a half years old when his father and he, both of foreign birth, came to the United States, and the proof showed that the father died a year or two after he came to this country: *Held,* that these facts excluded any presumption that the father was ever naturalized.

16. Where a person of foreign birth takes out his first papers for naturalization, upon which he votes, any presumption of his parent's naturalization, arising from his voting, will be effectually rebutted by the fact of the voter procuring his first papers.

17. SAME—*evidence—taking out naturalization papers after the election.* The testimony of a person voting at an election, that he has taken out naturalization papers since the election, such act being in the nature of an admission of a want of qualification, is inadmissible on a contest of the election. But when the party applied for naturalization papers before the time of voting, this is competent evidence of his want of qualification up to that time.

18. SAME—*misnomer in certificate of naturalization—parol evidence.* A misnomer in a naturalization paper will not vitiate the certificate. And when a certificate of naturalization is to "Henry Dunsmeyer," parol evidence is competent to show that it was issued, in fact, to "Heinrich Tansman," and to identify the real party. It is competent to show that Heinrich Tansman was known by the name of Dunsmeyer.

19. SAME—*certificate of naturalization—including two persons.* A certificate of naturalization issued to a person, which includes another person, though informal, is not invalid on that account.

20. SAME—*impeaching the certificate—by parol.* Where a certificate of naturalization is granted by a court of competent jurisdiction, evidence is not admissible to show that it was improperly granted, or was obtained by false or perjured testimony. But parol evidence is admissible to show that naturalization papers were fraudulently issued or procured, if the naturalization was in fact the act of the clerk, alone, and not the judgment of the court.

21. SAME—*residence of voter—acquiring a residence—removing from another State—intention, etc.* Where a person abandons his residence in another State by selling all his property, with the intention of removing to this State, and on his way he and his family make a temporary visit of several weeks, or even months, at a point without either of

those States, this will not gain for either him or his family a domicile in such place of their temporary sojourn.

22. The person so intending to change his place of residence, reached his place of destination in this State with the intention of residing there permanently, and being present, electing that place as his home, then, to all intents and purposes, he became a resident and inhabitant of that place, and, he being the head of a family and having a domicile there, it also becomes the domicile of his family, who were at the time visiting in another State.

23. SAME—*residence—continuation until another is acquired—only one voting place, at the same time.* A domicile once gained remains until a new one is acquired, and a man may acquire a domicile or residence if he be personally present at a place and elect that as his home. But a man can not have two or more "permanent abodes" or residences, in the sense of the constitution and the statute, in different jurisdictions, at one and the same time.

24. So one is not entitled to vote at any one time in either of two places, but must elect. When the circumstances are such that a man may claim a domicile at either one of two places, the place he regards as his home or domicile will be his residence for the purpose of voting.

25. SAME—*regaining a lost residence.* A party, after two years' absence from the State, may return to his former place of abode and acquire a domicile there again, though on his return he may have left some of his goods in the State from which he returned, for some months, and may have left an unexpired term in land leased by him in such other State.

26. SAME—*of the ballot—rule of construction.* A ballot is not required to be nicely or accurately written, or that the name of the candidate voted for shall be correctly spelled. It should be read in the light of all the circumstances surrounding the election and the voter, and the object should be to ascertain and carry into effect the intention of the voter, if it can be done with reasonable certainty.

27. The ballot should be liberally construed, and the intendments should be in favor of a reading and construction which will render the ballot effective, rather than in favor of a conclusion which will, on some technical ground, render it ineffective.

28. SAME—*certainty in the ballot.* But it is not admissible to say that something was intended which is contradictory of what was done ; and if the ballot is so defective as to fail to show any intention whatever, it must be disregarded.

29. So where the name of one candidate is erased from a ballot, and the letters interlined are so indistinct and illegible as that it fails to show any intention to vote for the opposing candidate, it should be counted for neither candidate, and treated as a blank.

30. SAME—*ballot without a number.* The name of a voter was number 28 on the poll-book, but there was no ballot of that number in the package of tickets in the office of the county clerk. The voter testified · that he saw the judge of the election put the ballot in the ballot-box, and there was no evidence tending to show the voter's ballot was not in the package by a wrong number, and there was proof showing several mistakes in numbering the ballots: *Held,* no ground for rejecting the entire poll, it being probable that the ballot voted was one which was wrongly numbered by mistake.

31. A person whose name on the poll-book was No. 107, testified that he did not live in that precinct and did not vote there, and that there was no other person residing in that precinct having the same name, that he knew of, but that he was not generally acquainted in such precinct: *Held,* that the evidence was not sufficient to shift the burden of proof on the party claiming the benefit of such ballot, to show affirmatively that the voter of such ballot was a *bona fide* resident of that precinct. There may have been two persons of that name.

32. SAME—*rejecting unnumbered ballots.* The statute requires that when the ballots found in the box exceed the number of names entered on each of the poll-lists, then the judges shall reject the ballots, if any be found, upon which no number is marked. The failure of the judges to discharge this duty will not preclude the court, in case of a contest, from carrying into effect the mandate of the statute.

33. SAME—*name in ballot—abbreviation or contraction of it—identifying person voted for.* The printed name "John B. Kreitz" was erased from a ballot, and the name "F. A. Behrn" was written under it, the opposing candidate's name being Charles F. A. Behrensmeyer, and the ticket showed why the residue of the name did not appear thereon: *Held,* that the word "Behrn" was intended as a contraction of the name Behrensmeyer, and that the vote was properly counted for him.

34. But where a candidate's name is Behrensmeyer, ballots for "Dehbsumeyer" can not be aided by extraneous proof, for want of such similarity of sound in the two names as might induce one to be mistaken for the other.

35. On the contest of an election, any evidence going to prove that the voter had intended and attempted to express the contestee's name as he understood it, is admissible, when it appears that such candidate's name is differently pronounced as well as differently spelled.

36. The printed name of a candidate on a ticket voted was erased, and the word "Kri," in pencil, written to the right of it, and reaching to the edge of the ticket: *Held,* that the same was properly counted for John B. Kreitz, a candidate at such election.

37. Where it is shown there are two men, one named John B. Kreitz and the other John M. Kreitz, and that the name of the first has been

erased and the name of the latter written in its place on a ballot for an office, a latent ambiguity will be presented, and if no further testimony is introduced, the presumption of fact, from the circumstances that one is and the other is not a candidate, will be, that the vote is intended for the one who is a candidate. But oral testimony is admissible to explain the ambiguity, and it is error to refuse such testimony.

38. SAME—*writing one name over another, in the ballot.* Where the name of one candidate is written on and across the name of his opponent, it will be presumed that the voter intended, by one and the same act, to erase the name of the one and insert the name of the other candidate.

39. SAME—*interlining a ballot with the name of another candidate.* The name of one candidate for a county office was erased and the name of another candidate written in pencil over the title of the office, such name touching, in one place, the title of the office : *Held,* that no cancellation of the title of the office was intended, and that the ballot showed a vote for the candidate whose name was written over the title of the office. If this is not so, it was competent to prove by the voter that the erasure of the title was accidental. So when the name interlined is written in pencil into and across the title of the office, it is no evidence of an intention to cancel the printed title of the office.

40. SAME—*candidate's name repeated in ballot.* Where the name of one candidate is erased and the name of his opponent written in substitution, the fact that his name is written in two places upon the ticket, in a cramped and contracted form on a line with the erasure, and in a more legible shape thereunder, will not invalidate the ballot. Such ballot designates but one person for the office, and is not a double ballot.

41. SAME—*two names for the same office.* A ballot cast at an election containing two different names for one and the same office is properly counted for no one.

42. SAME—*forgery of ballot—substitution of ballot for another that has been voted.* It is competent to show that a ticket is a forgery. A ticket changed by a paster to read as a vote for a man for a particular office different from the man for whom it read when cast, is a forgery ; and the same is true where the ballot, after it is cast, is destroyed, and another and different ballot put in its place.

43. SAME—*double voting—both votes rejected.* It has been held, that if a man votes twice at an election when he is only entitled to vote once, then both votes must be rejected,—and this, irrespective of the question whether such acts were done intentionally, ignorantly or by mistake.

44. A person offered his ballot, which was numbered and deposited in the ballot-box, when it was discovered that his name was not on the

registry, and that his voting place was at another precinct. His vote, on the canvass, was not counted, but he afterwards voted in his own precinct. On a contest of the election the county court refused to allow either of his votes: *Held,* no error in such ruling.

45. SAME—*for whom a person voted—parol evidence—to contradict the ballot cast.* A voter can not be allowed to testify that he voted for one person, when he admits that he cast a ballot, which has not since been changed, showing that he voted for another person. This is merely on the principle that a writing can not be contradicted by parol.

46. DEPOSITIONS—*caption and certificate.* The statute has fixed no form for either the caption or certificate to be attached to depositions. If they are taken and certified in substantial conformity with the requirements of the statute, they will not be suppressed on merely technical objections.

47. SAME—*taken by typewriter—and by whom taken.* The fact that depositions are taken by a typewriter does not show they were not "reduced to writing," as required by the statute. And when the notary named in the notice certifies that "each of said depositions was so taken by me," etc., there can be no presumption that any of the depositions were taken by any other than such notary.

48. MISNOMER IN JUDGMENT—*parol evidence.* Where a party to a record is incorrectly named, he may be connected with the judgment by proper averments; and when such averments are proved, the party intended to be named in the judgment will be affected, the same as if his real name was used.

49. INQUEST OF LUNACY—*service of process—sufficiency—waiver.* An order of the county court finding a person to be insane, when the record shows only nine days' service, and that by reading instead of by copy and for ten days, as the statute required, is void for want of jurisdiction, and is not evidence of the insanity of such person.

50. The voluntary appearance of one charged with lunacy or insanity to a proceeding to have him adjudged insane, will not cure a defective service of process on the alleged lunatic. If insane, he is incompetent to waive any right.

APPEAL from the County Court of Brown county; the Hon. JOHN J. McDANNOLD, Judge, presiding.

Mr. WILLIAM McFADON, and Mr. WILLIAM L. VANDEVENTER, for the appellant:

The intent of the voter is to be deduced from his ballot, and a reasonable construction of his acts in connection therewith.

*State* v. *Foster,* 38 Ohio St. 694; *People* v. *Saxon,* 22 N. Y. 309; *People* v. *Pease,* 27 id. 45; *People* v. *Matteson,* 17 Ill. 169; *People* v. *McKinnon,* 110 id. 307; *Bacon* v. *Malzacher,* 102 id. 664; *Clark* v. *Robinson,* 88 id. 500; *Talkington* v. *Turner,* 71 id. 234.

After voting, a presumption arises that the voter was a legal voter, and unless such presumption be overcome by positive evidence the ballot must be counted. *Clark* v. *Robinson,* 88 Ill. 500; *Kuykendall* v. *Harker,* 89 id. 126.

From voting, the presumption includes everthing necessary to make the person so voting a qualified voter; and residence of sufficient time in the precinct where he voted being one requisite, the presumption covers this as well. *Harbaugh* v. *Cicott,* 33 Mich. 252.

The presumption of the legality of a vote is overcome when it appears in evidence that the voter was foreign born, and has only declared his intention to become a citizen,—or, in other words, when such person is voting on his first papers. *Clark* v. *Robinson,* 88 Ill. 499; *Beardstown* v. *Virginia,* 81 id. 543; McCrary on Elections, (2d ed.) sec. 294.

The presumption of legality arising from the fact of a ballot being cast, is not, however, overcome in case of a foreign born person who came to the United States in infancy, with his parents, unless it be also further proven that the father himself was not naturalized during the minority of such infant. *Beardstown* v. *Virginia,* 81 Ill. 583; 76 id. 48.

A misnomer in a naturalization paper does not vitiate the certificate. *Beardstown* v. *Virginia,* 81 Ill. 543.

The naturalization paper actually issued and delivered to John Waack by the name of George Waack, and the one actually granted and delivered to Henry Tansman by the name of Henry Dunsmeyer, were properly held by the county court to naturalize John Waack and Henry Tansman, respectively, the rule being, that a party may show, by parol evidence, that the most solemn instruments were intended for and de-

livered to him by another name. *Pinckard* v. *Milmine*, 76 Ill. 453; *Barker* v. *Garvey*, 83 id. 184; *Fisher* v. *Milmine*, 94 id. 328; *Pond* v. *Ennis*, 69 id. 342.

If the declarations of a voter on the subject of his residence are admissible at all against contestant, it can only be when such declarations are a part of the *res gestæ*. Declarations of a voter descriptive of a past event, and not a part of the *res gestæ*, can never be admissible against the contestant. *Inhabitants of Salem* v. *Lynn*, 13 Metc. 545; *Inhabitants of Brookfield* v. *Warren*, 128 Mass. 288.

But in any event, the testimony of third parties as to such admissions and declarations made to them some time back by another, (the subject matter being one in which such third parties had no interest,) is to be received with great caution by courts. *Harris* v. *McIntyre*, 118 Ill. 277; *Bragg* v. *Geddes*, 93 id. 60; *Printup* v. *Mitchell*, 17 Ga. 558.

One who leaves his place of residence with only a conditional intention of abandoning it, does not lose his residence so long as that intention remains conditional. *Wilkins* v. *Marshall*, 80 Ill. 77; *Beardstown* v. *Virginia*, 81 id. 550; *Potts* v. *Davenport*, 79 id. 456; *Smith* v. *People*, 44 id. 16; *Kitchell* v. *Burgwin*, 21 id. 40.

The intention of a party has a controlling force in determining his residence. *Cobb* v. *Smith*, 88 Ill. 201; *Wilkins* v. *Marshall*, 80 id. 78.

A residence is only lost by a union of act and intention. *Smith* v. *People*, 44 Ill. 16.

As applicable to Pfauschmidt, who voted at Ellington in the spring of 1886, and Melvin, who voted at Honey Creek, the act of voting is to be taken as the strongest proof that they regarded their residence at that time as being where they voted. *Cobb* v. *Smith*, 88 Ill. 201; Jacobs on Domicile, sec. 435.

The poll-books, while *prima facie* evidence as to the number of votes received for the respective candidates, are nevertheless, under the laws of Illinois, the highest and best evidence

of the person's voting at a precinct at the time of an election. *Wilson* v. *State*, 52 Ala. 299 ; *Blackwell* v. *Thompson*, 2 Stew. & Port. 348 ; *People* v. *Pease*, 27 N. Y. 45 ; *Harris* v. *Whitcomb*, 4 Gray, 434.

The uncorroborated testimony of the voter himself that he voted for one person while his ballot shows he voted for another, is insufficient to establish that his ballot has been changed, as against the concurrent testimony of the election officials of the precinct where he voted, and of the county clerk of the county, to the effect that no changes had been made in ballots while they were in their custody, respectively, and the ballot itself, and the presumption obtaining as to public officials that they have acted honestly and done their duty. *Blackman* v. *Hawks*, 89 Ill. 513 ; *Tunison* v. *Chamblin*, 88 id. 370.

Even if it were necessary to give the names of the alleged illegal voters in contestant's petition or statement of contest, nevertheless, where, as in this case, the contestee has specially demurred to such petition, for the reason that such names are not contained therein, and his demurrer has been overruled, and instead of abiding his demurrer he has taken issue on the allegations of the petition in that behalf, and gone through one trial of the case on such issues, the contestee can not, in a second trial of the cause, urge as an objection to testimony when offered, relating to alleged illegal voters, that their names are not contained in such petition or statement. *Kreitz* v. *Behrensmeyer*, 125 Ill. 150.

Messrs. CARTER & GOVERT, and Mr. C. A. BABCOCK, for the appellee :

The count made at the close of the polls, before it was known how many ballots must be changed to affect the result, is better evidence than any subsequent recount, unless it is shown there was no opportunity to tamper with the ballots. *People* v. *Burden*, 45 Cal. 241 ; *Hudson* v. *Solomon*, 19 Kan.

177; McCrary on Elections, (2d ed.) 249; Cooley's Const. Lim. (1st ed.) 625.

The burden of proof upon the main issue is upon the contestant. *Kreitz* v. *Behrensmeyer*, 125 Ill. 141.

Testimony of voters that they voted a certain kind of ballot or ballots for a certain individual, and that such ballots are not among the ballots returned, is legitimate to attack a return or recount. *Reid* v. *Julian*, 2 Bart. 922; *Loyal* v. *Newton*, 1 id. 522; *Kreitz* v. *Behrensmeyer*, 125 Ill. 141; McCrary on Elections, (2d ed.) 386.

Voting a second time at the same election is prohibited by statute, and the fact that the first vote is illegal is no excuse, even in case of indictment, for voting the second time, and both ballots will be rejected. *State* v. *Perkins*, 42 Vt. 399; *People* v. *Holden*, 28 Cal. 124; *Harbaugh* v. *Cicott*, 33 Mich. 242; McCrary on Elections, (3d ed.) 199; Starr & Curtis' Stat. sec. 83; Election Law, p. 1014.

The voting is done when the ballot is deposited. *Clark* v. *Robinson*, 88 Ill. 504.

Residence, to constitute one a voter, must be a home without any present intention of leaving it for another; but once having acquired a home it will continue, until, by a coincidence of act and intention, it is abandoned for another. *Smith* v. *People*, 44 Ill. 16; Cooley's Const. Lim. 600.

Determination to change one's residence and to sojourn at the contemplated place of residence, with renting a house thereof an indefinite duration, followed by removal of family or household effects, operates a change of residence when the family or effects are removed, and not until then. *Williams* v. *Whiting*, 11 Mass. 424; 49 Am. Rep. 606; 76 Me. 158.

Leaving one's home with contemplation of possible abandonment of it will not lose a residence, nor when a home is abandoned for another will contemplation of possible return retain it. The residence is the place where one has settled himself and his home interests, with no present intention of

leaving it.   *Dale* v. *Irwin,* 78 Ill. 181; *Hays* v. *Hays,* 74 id. 312; *Wilkins* v. *Marshall,* 80 id. 74.

That place to which one returns when temporary employments are ended,—the seat of one's affections and interests,—is one's residence, within the meaning of the election law. Appendix to McCrary on Elections, (2d ed.) 449.

When a man is married and lives with his family, an intended removal or change of residence is only accomplished when he has located himself in the new domicile with his family.   *Williams* v. *Whiting,* 11 Mass. 423; *Waterborough* v. *Newfield,* 8 Greenlf. 203; 59 Am. Dec. 115.

A dwelling house or place,—a home,—is a necessary part of a domicile or residence.   *Warren* v. *Thomaston,* 69 Am. Dec. 73.

Proof of alienage is not made out by proof of birth in a foreign land, but by proof of birth out of the allegiance of the United States,—in other words, birth out of the jurisdiction of the United States, and of alien parents.   Children of ambassadors born in this country may be aliens, but alien children must be born of alien parents.   *Clark* v. *Robinson,* 88 Ill. 512; Abbott's Trial Evidence, 102, and cases cited; *Shanks* v. *Dupont,* 3 Pet. 247; U. S. Rev. Stat. sec. 1993; *United States* v. *Gordon,* 2 Blatchf. 18; *Young* v. *Peck,* 21 Wend. 389.

The county courts of Illinois and other States, and the probate courts of Ohio, are authorized to give certificates of naturalization.   *People* v. *McGowan,* 77 Ill. 644; *Beardstown* v. *Virginia,* 81 id. 541.

A judgment may be impeached for fraud by parol evidence. *Arnold* v. *Gifford,* 62 Ill. 252; McCrary on Elections, (3d ed.) sec. 433; Freeman on Judgments, secs. 336, 591.

Parol evidence is not admissible to explain a record, much less to contradict or correct it.   *(Bisbee* v. *Woodbury,* 8 Bradw. 336; 1 Greenleaf on Evidence, sec. 19.)   Nor in any way to impeach it, except for fraud in procurement.   *Vincent* v. *People,* 25 Ill. 500; *Blackburn* v. *Bell,* 91 id. 434; *Lawyer* v. *Lang-*

*hans*, 85 id. 142; *Kemper* v. *Waverly*, 81 id. 298; *Thatcher* v. *Maack*, 7 Bradw. 635; *Garfield* v. *Douglas*, 22 Ill. 100; Freeman on Judgments, sec. 39.

A stranger to a judgment can not question its regularity collaterally.    62 Ill. 25.

All contemporaneous writings relating to the same subject matter are admissible, and consequently the registers kept at the election are equally admissible with the poll-books, tally-sheets and ballots, and where they disagree, and raise an ambiguity, parol evidence is admissible to explain it.    *State* v. *Pierce*, 35 Wis. 97; 1 Greenleaf on Evidence, sec. 283, and cases cited; secs. 297, 300.

Parol evidence is admissible to show how a ballot came to be unnumbered, or whether double or not.    *State* v. *Pierce*, 35 Wis. 97.

Ballots which can be plainly read, and ballots which in themselves are so defective that they fail to show any intention whatever, may not be explained by any parol testimony. McCrary on Elections, (3d ed.) p. 331, sec. 494; Cooley's Const. Lim. (4th ed.) secs. 769, 770, 790; *Kreitz* v. *Behrensmeyer*, 125 Ill. 141.

Ballots in evidence are to be treated precisely like other written instruments in evidence.    Although they may not be changed or supplemented by parol, yet the genuineness or authenticity of a ballot, or whether, when cast, it was folded within another, may be shown by parol.    Cooley's Const. Lim. (4th ed.) 790, 579, 770; *Kreitz* v. *Behrensmeyer*, 125 Ill. 141; *State* v. *Pierce*, 35 Wis. 79.

The testimony of a voter can not be received to explain a ballot otherwise fatally defective, or that he voted the particular ballot and intended it for a particular candidate.    The intention of the voter must be that which is expressed in due form of law,—not that which remains hidden in the elector's breast.    Cooley's Const. Lim. (1st ed.) 611, and cases cited.

The paper ballot cast by the voter is to prevail as the highest evidence of his intention. *Columbus* v. *Dahn*, 36 Ind. 335; *Beardstown* v. *Virginia*, 76 Ill. 49; *People* v. *Higgins*, 3 Mich. 234.

If more persons are designated for an office than there are candidates to be elected, such part of the ticket will not be counted for either of the candidates. Election act, chap. 46, secs. 58, 59; 1 Starr & Curtis, 1009; *Clark* v. *Robinson*, 88 Ill. 500; *People* v. *Seaman*, 5 Denio, 412.

Mr. JUSTICE BAKER delivered the opinion of the Court:

This cause was before us at a former term, and is reported as *Kreitz* v. *Behrensmeyer*, 125 Ill. 141. A statement of the pleadings and of the general facts of the case, and a discussion of many of the more important questions involved in the controversy, will there be found. At that time the judgment was reversed, and the cause was remanded for further proceedings consistent with the opinion then filed. Upon the filing of the remanding order in the county court of Adams county, the venue was changed to the county court of Brown county, where the second trial was had and the present decree rendered.

At the general election held on November 2, 1886, there were three candidates for the office of county treasurer of Adams county,—Charles F. A. Behrensmeyer, the now appellant, was the republican candidate, John B. Kreitz, appellee, the democratic candidate, and B. L. Dickerman the prohibition candidate. The result, as declared by the canvassing board, was, that Behrensmeyer had received 4604 votes, Kreitz 4618 votes, and B. L. Dickerman 272, making a plurality of 14 votes for Kreitz over Behrensmeyer. The election of Kreitz was contested by Behrensmeyer, and the final decree upon the first trial, which was had in the Adams county court, adjudged that Behrensmeyer had received 4597 votes, Kreitz 4587 votes, and Dickerman 274 votes, and that Behrensmeyer was elected treasurer of said Adams county by a plurality of ten votes over

Kreitz. Upon the second trial, in the Brown county court, the decree was that Kreitz had received 4573 legal votes, Behrensmeyer 4565 legal votes, and Dickerman 277 legal votes, and that Kreitz, having a plurality of eight votes over Behrensmeyer, was entitled to the office, and the present appeal is from this latter decree.

It went without contest at the last trial that Kreitz had received 4520 legal votes, Behrensmeyer 4511 legal votes, and Dickerman 277 legal votes. It was also admitted that 178 ballots were polled which were blank in respect to the office in question. The contest was in regard to 212 remaining votes. It is now conceded by both parties that 21 additional ballots were illegal, to-wit, the votes of Ferdinand Kowatz, William Ehe, Fred Dickman, F. W. Moritz, Harry Neudoerffer, J. C. Graves, Herman Pilgrim, A. Kampe, L. Speckhart, William Boge, Gottlieb Boge, Henry Growe, August Hoecker, Gustav Appenbrink, August Vanderboom, Charles Warmke, one double ballot (163) cast in the precinct of Columbus, one double ballot (160) cast in the precinct of Payson, and double ballots 221, 283 and 294 cast in the fourteenth election district of Quincy. It is also now conceded by both parties that ballot 239 of the third district of Quincy was for Richard Seaton, ballot 54 of the sixth district of Quincy was for Richard Seaton, ballot 251 of the ninth district of Quincy was for Vincent France, and ballot 212 of the fifteenth district of Quincy was for W. Hazelwood, for county treasurer, and that the ballot of Charles Klaubus was a blank in respect to that office. We may therefore deduct 26 ballots from the 212 contested votes, thereby leaving 186 votes for consideration. It is also admitted, as a result of the proofs on the hearing, that ballots 169 of Burton precinct, 177 of Richfield precinct, and 208 of the third district of Quincy, were valid votes for Kreitz, and that ballot 198 of said third district was a valid vote for Behrensmeyer. It is likewise admitted that the unnumbered ballot cast in the precinct of Lima for appellant was a valid vote for him.

It is virtually conceded that the evidence sufficiently shows that Charles Miller, James Monteith, Henry Simons, Fred Dickman, Jr., Henry Wensing, Philip Ott, Barney Kloepper, Herman Jansen, Thomas Siebers, Henry Burghorst, Theo. Kemner and William Schatzley, each, cast an illegal vote for Kreitz for treasurer. It is objected, however, by appellee, that there was no allegation in the petition of contestant under which evidence of such illegality was admissible, and that it was error in the trial court to admit the same. The petition contains the following averments, only, in regard to illegal votes for appellee: That William Childers voted at Melrose, and was an illegal voter; that F. C. Inman voted illegally at the third district of Quincy, for Kreitz for treasurer, and that he was not twenty-one years of age when he so voted; that at Liberty three persons voted illegally for Kreitz for treasurer, and that at some of the precincts and districts of said Adams county other illegal votes than those above named were cast by persons not legal voters, for Kreitz, for said office of treasurer, and counted by the election judges for him. If appellee regarded this latter allegation as so indefinite as that it was no allegation whatever, he should have interposed a demurrer and should have abided by it. He, however, elected to file an answer to the petition, and therein, among other things, denied that William Childers was an illegal voter; denied that F. C. Inman, voting at the third district of Quincy, was an illegal voter, under twenty-one years of age, and asserted he was twenty-one years of age; denied that at Liberty three illegal votes were cast and counted by the judges for Kreitz for treasurer, and averred that no illegal votes were cast at Liberty precinct for Kreitz, and denied that at any precinct of said county any illegal votes were cast for Kreitz for treasurer, and denied that the judges at said respective election precincts counted any votes for Kreitz not legal votes.

We can not concur in the suggestion that under the allegation of other illegal votes in some of the precincts and districts

of Adams county, appellant should be limited to proof of two illegal votes other than the five alleged to have been cast in Melrose and Liberty and the third district of Quincy, and should be restricted, in regard to proof of these two illegal votes, to precincts other than the three that are particularly specified. The averment was, without doubt, too general and indefinite, but as appellee was content to take issue upon it, the words used must receive their usual and reasonable interpretation. By the expression, "some of the precincts and districts," is plainly meant an indefinite number of precincts and districts, but, at the same time, a number less than all the precincts and districts in the county. The words, "other illegal votes," plainly signify illegal votes different from those which had been specified in the petition, and additional to them, and we find nothing in the words that would exclude the idea such additional illegal votes might have been cast in the election districts that are particularly named. We think there was no error in admitting the testimony in question, and that the twelve illegal votes above mentioned should not be counted for appellee.

John Harrison voted for appellant in the second district of Quincy, and his vote was excluded by the trial court on the ground it was illegal. The sole ground upon which this action of the court is questioned, is, that the only testimony to show he was alien born and had never been naturalized was his own deposition, and the claim that such deposition should, on appellant's motion, have been suppressed. The record shows that appellant entered motions to suppress four separate series of depositions that had been taken by appellee, and that these several motions were overruled by the court. The deposition of John Harrison, here under consideration, was included in one of these series. All the depositions seem to have been taken and certified in substantial conformity with the requirements of section 30 of the Evidence and Depositions act. The criticisms made upon the captions and certificates are tech-

nical and without merit. The statute has fixed no form for either the caption or certificate to be attached to the depositions. The fact the depositions were taken with a typewriter does not show they were not "reduced to writing," as required by the statute. There can be no presumption any of the depositions were taken by any one other than the notary named in the notices, for he certifies to each of the series that "each of said depositions was so taken by me," etc. We find no error in the rulings of the court denying the motions to suppress, or in its finding that the vote of John Harrison was invalid, and should not be counted for appellant.

Appellee claims, by way of cross-error, that the entire returns and ballots of the ninth district of Quincy should be excluded, or that, at the least, the ballot should be discredited and the certified returns of the election officers regarded as the best evidence of the vote. That there were some irregularities at this polling place, there is no question. Steinkamp, one of the judges, made probably as many as ten mistakes in numbering the ballots; but the evidence shows this was purely accidental, and from a lack of memory. So, also, the election officers, after the close of the polls, took the ballots to a room up-stairs and there canvassed the votes, instead of canvassing them in the room or place where the election was held, as provided by the statute. There were also other irregularities of like character; but the evidence seems to satisfactorily show that none of these irregularities affected, in any manner, the result of the election, and there is no testimony tending to prove fraud or improper motives on the part of the election officers, or that any injury to any one was the result of their conduct. In *Hodge, Jr.* v. *Linn*, 100 Ill. 397, there was a failure to number any of the ballots cast at the election, and various other irregularities of a character quite as serious as those here involved, and it was there held that the provisions of the statute as to the mode and manner of conducting the details of an election are not mandatory, but directory, merely,

and that irregularities in conducting an election and counting the votes, not proceeding from any wrongful intent, and which deprive no legal voter of his vote and do not change the result, will not vitiate the election or justify the rejection of the entire poll of the precinct in which the irregularities occurred.

The circumstances in regard to Thomas ·J. Seehorn, John Rouse and Christian Sebrasse are of but little, if any, probative force. Seehorn was number 28 on the poll-book, and there was no ballot 28 in the package of tickets in the office of the county clerk; but Seehorn testifies that he saw Steinkamp put the ballot in the ballot-box, and there is no testimony tending to show his ballot was not in the package, but with a wrong number upon it. The probabilities are that it was one of those upon which Steinkamp inadvertently placed a wrong number. John Rouse appears upon the poll-book as having voted ballot 107, and one John Rouse testified that he did not live in that precinct and did not vote there, and further, that there was not any other John Rouse living in that part of the city that he knew of; but he further stated, that during the year 1886 he was not generally acquainted in the ninth election district of Quincy. So one Christ Sebrasse appears from the poll-book to have voted ballot 199, and from the testimony of one Christian Siebrasse it appears that he, said Christian, came to this country in 1884, was seventeen years old in 1886, and did not vote at the November election of that year, and further, that he never knew any other Chris. Siebrasse; but it does not appear that the witness had an extensive or intimate acquaintance with the inhabitants of the ninth district. The matters in evidence in respect to ballots 107 and 199 were not sufficient to shift the burden of proof upon appellant, and require him to show affirmatively that the voters of said ballots were *bona fide* residents of and voters in the precinct. See McCrary on Elections, (2d ed.) sec. 356, and cases there cited. In the very case at bar there were, in several instances, two or more residents and voters of the

same name in one and the same precinct, and it even appears that in the tenth district of Quincy four different men bearing the name Henry Dix voted at the election. In our opinion, neither the returns nor the ballots of the ninth district should be either excluded or disregarded.

J. W. Davis voted ballot 143 in Clayton precinct, Lee Gosling voted ballot 14 in the third district of Quincy, Herman Hirsch voted ballot 68 in the same district, James Clemens voted ballot 143 in the same district, Douglas Scheiner voted ballot 195 in the fifth district of Quincy, William C. Thomas voted ballot 132 in the sixth district of Quincy, and Henry Homberg voted ballot 276 in the ninth district of Quincy. Upon the recounting of the ballots had in the county court of Adams county, six of the above designated ballots appeared to be for Behrensmeyer for treasurer, and the remaining one of said ballots, being said number 132 of the sixth district, appeared to be for M. W. Seaton for said office. The contention of appellee is, that said seven ballots, as they appeared at the recounting, were not the ballots that had been cast by said seven voters, respectively, at the election, but that each and every of said ballots, when voted, was for Kreitz for treasurer, and that they had subsequently been changed, or other ballots substituted for them. We can not agree with appellant that the case presented upon the evidence is merely that of voters saying they voted one way while their ballots indicated they voted another, and that the decision in *Beardstown* v. *Virginia*, 76 Ill. 34, should control in regard to the matter now in hand. In that case, no fraud was disclosed or claimed. It was there expressly said: "Were there independent proof of fraud, a different question would be presented." Upon the former appeal of this case, (*Kreitz* v. *Behrensmeyer*, 125 Ill. 141,) it was said: "It is undoubtedly true that a voter can not be allowed to say that he voted for one person, when he admits that he cast a ballot, which has not since been changed, showing that he voted for another person. But this is merely

upon the principle that a writing can not be contradicted by parol. It is, however, always competent to show that even the most solemn writings are forgeries; and a ticket which has been changed, by a paster, to read as a vote for a man for a particular office different from the man for whom it read as a vote in the condition in which it was when cast, is a forgery. And the same is true where the ballot, after it is cast, is destroyed, and another and different ballot is put in its place."

Upon the evidence heard by the trial court and contained in this record, that court found and adjudged that the ballots of Davis, of Hirsch and of Scheiner, when polled, were for Kreitz, but had since been changed, and should therefore be counted for appellee, and also found that the ballots of Gosling, of Clemens, of Thomas and of Homberg had not been changed, and that the votes of Gosling, Clemens and Homberg should be counted for appellant. Neither party to this controversy is satisfied with this adjudication, appellee insisting that all seven of said votes should be adjudged to him, and appellant, that six of them should be counted for him and the remaining vote for Seaton.

The questions presented for decision are questions of fact. Were the ballots the ballots which were cast? Appellee admits that as to Clemens, Homberg, Thomas and Gosling there were elements of uncertainty as compared with Davis, Hirsch and Scheiner; that Clemens remembered less perfectly about the ticket he voted; that there was some testimony that Gosling was intoxicated on election day; that the ticket actually voted by Homberg might have been improperly numbered, it having been cast in the ninth district, where numerous mistakes in numbering were made, and being a straight and unscratched democratic ticket, could not subsequently be distinguished from others of like character; and that in the case of Thomas the ticket supposed to be substituted for his does not so directly suggest the motive for the change. The testimony of Davis,

Hirsch and Scheiner is positive their ballots were changed, and each states circumstances in corroboration of his statement,—Davis, that "his handwriting was on his ticket," Scheiner, that he read his ticket and made a memorandum of the number placed on it, and Hirsch, that he selected a straight democratic ticket, without scratches, and with the name of Kreitz printed on it, while at his store, put it in his pocket and went to the polls and voted it, and that before the election he had told Kreitz he would certainly vote for him. The court below not only heard the evidence of these several voters, but also the rebutting testimony of the judges and clerks of election at the respective polls, and was in a better position to judge of the credibility of the various witnesses and of the weight due to their testimony than we are. No useful purpose can be subserved by a lengthy discussion of the evidence bearing on the points in question. Suffice it to say, that we are unable to come to the conclusion that the holding of the court in the premises was erroneous. We may add, in this connection, that ballot 271 of Clayton precinct was objected to by appellee and counted among the contested votes. It is admitted by appellee that it is plainly for Behrensmeyer, as claimed by appellant, and that objection was made to it merely for the purpose of preserving it in the record for the evidence it afforded in connection with the testimony of Bartlett in regard to ballot 143 of the same precinct.

In respect to some forty ballots that are claimed to have been cast for Behrensmeyer, it is urged that the names designated thereon for the office of treasurer do not sufficiently indicate they were intended to be polled for appellant; and so, on the other hand, it is insisted that some twenty supposed Kreitz ballots should not, for like uncertainty in regard to name, be counted for appellee. At the former hearing of this cause in this court it was said: "It was likewise in proof that there were other persons than appellee (Behrensmeyer) in Adams county of the name of Behrensmeyer, and appellant

objected to many ballots counted for appellee which had merely Behrensmeyer upon them, for treasurer, without any designation of the christian name. It was shown that no other Behrensmeyer was a candidate, at that election, for the office of treasurer, or any other office, and we think, therefore, the court properly counted the ballots as cast for appellee. Appellant also objects that parol evidence was admitted to explain what name was intended by certain obscurely and imperfectly written ballots which were counted for appellee. So far as those ballots could, by one able to read them, be given a sound which might be understood to be intended to express the name Behrensmeyer, or that name as it was pronounced by any number of people, we think the evidence was properly admitted. There was evidence that some persons pronounced the name as Benmire, and perhaps that others pronounced it by a still shorter name. Any evidence, therefore, proving that the voter had intended and attempted to express appellee's name as he understood it, was properly admissible. Objections of like character were made to tickets counted for appellant, and, of course, the same rule was properly applied there. It is evident that imperfect spellers might spell Kreitz, 'Krietz,' 'Kritz,' 'Critz,' or even omitting the 'z.' We recall only two instances in which we think the rule in this respect was misapplied. In certain ballots it was claimed the name written for treasurer was 'John B. Knirs,' and in certain other ballots it was claimed the name written for treasurer was 'Dehbumeyer.' If these letters were really employed, we think the ballots could not be aided by extraneous proof, since we discover no such similarity in sound between these names and the names of the candidates as might induce the one to be mistaken for the other, and, plainly, neither can be intended as a contraction of the name of the candidate. It is not improbable, however, that this results from a misapprehension of the characters employed."

It appears from the evidence at the last hearing, that the name of appellant is a German name, and that it is properly pronounced, in German, "Bay-rens-may-er,"—a word of four syllables,—but that it was by the Americans, prior to the election, most commonly pronounced "Burns-meyer" and "Bens-meyer," in two syllables. Other pronunciations of the name shown by the testimony, and ante-dating the election, are: Benneyer, Behmyr, Benmeyer, Bernemyer, Benshmeyer, Burn-meyer, Burmeyer, Brenmeyer, Pehrensmeyer, Behmeyer, Bons-meyer, Bindmeyer, Brondsmeyer and Benshsmeyer. It also appears he was frequently called Adolph. It also appears in evidence that there were various pronunciations of appellee's name in use prior to the election. These pronunciations were: Crits, Kritz, Chitz, Keitz, Keetz, Critz, Ceits, Christtse, Christts, Crestees, Cretts, Criss, Creis, Krests, Kretz, Crats and Krutz.

The original ballots upon which the questions now under discussion arise, have, by agreement of parties, been brought to this court and submitted to our inspection. We have carefully examined these ballots with the aid of proper glasses, and although some of the writing is quite indistinct, and much of it was evidently done hastily and by very crude and inexperienced penmen, yet we have found but little difficulty in arriving at what are to us satisfactory and decided conclusions in respect to the names thereon written. It is also believed that these conclusions are in the main, if not altogether, corroborated by the oral evidence heard at the trial.

In our opinion, the names that are written upon the said supposed Behrensmeyer ballots for treasurer, are as follows: Upon ballot 91 of Burton precinct the name of "Behenmyre," upon ballot 193 of Burton precinct "C. Behrsmeyer," upon ballot 26 of Columbus precinct the name "banesmyer," upon ballot 100 of Columbus precinct the name "Benere," upon ballot 60 of Gilmer precinct the name "Bensmyer," upon ballot 101 of Gilmer precinct the name "Bernshmeyer," upon ballot 102 of Gilmer precinct the name "Benshmyer," upon ballot 205

of Gilmer precinct the name "Benshmyre," upon ballot 222 of
Gilmer precinct the name "Benshmyer," upon ballot 261 of
Liberty precinct the name "Charles F. Behrensmeyer," upon
ballot 45 of Melrose precinct the name "Bernsmere," upon
ballot 204 of said second district the name "A. Barnsmoer,"
upon ballot 39 of the fourth district of Quincy the name "Ber-
hensmeyer," upon ballot 208 of said district the name "Bernst-
meyer," upon ballot 160 of the seventh district of Quincy the
name of "C. H. Berensmyer," upon ballot 206 of the same
district the name "Behrensmeyer, C. F. A.," upon ballot 269
of the same district the name "Bernmyer," upon ballot 343 of
the ninth district of Quincy the name "C. F. A. Bernsmier,"
upon ballot 22 of the tenth district of Quincy the name "Beh-
rensmier," upon ballot 203 of the twelfth district of Quincy
the name "Benmyr," upon ballot 248 of the same district
"Berenmyer," upon ballot 278 of the thirteenth district of
Quincy the name "Bernmyer," upon ballot 127 of the four-
teenth district of Quincy the name "A. H. Behnsmeyer," and
upon ballot 276 of said district the name "Berntsmire," and
we further find that upon ballots 234 and 286 of the same
district the name of appellant appears for the office of treas-
urer, and is clearly not erased upon either.

A ballot is indicative of the will of the voter. It is not re-
quired that it should be nicely or accurately written, or that
the name of the candidate voted for should be correctly spelled.
It should be read in the light of all the circumstances sur-
rounding the election and the voter, and the object should be
to ascertain and carry into effect the intention of the voter, if
it can be determined with reasonable certainty. The ballot
should be liberally construed, and the intendments should be
in favor of a reading and construction which will render the
ballot effective, rather than in favor of a conclusion which will,
on some technical ground, render it ineffective. At the same
time, it is not admissible to say that something was intended
which is contradictory of what was done; and if the ballot is

so defective as to fail to show any intention whatever, it must be disregarded.

In the light of the ballots themselves, and of the different pronunciations and spellings of the name of appellant which were in vogue prior to the election, and of the other evidence which appears in the record, we are of the opinion that the twenty-six ballots above mentioned should be counted for appellant.

The name of appellee upon ballot 31 of Gilmer precinct is erased, but the letters interlined are so very indistinct and illegible as that it fails to show any intention to vote for appellant. We think it was error in the county court to count it for appellant.

Ballot 146 of Mendon precinct was plainly for "C. F. A. Dehbensmeyer," and the court properly refused to hold it was a vote for appellant, or to hear oral testimony in regard to it. So, also, the name upon ballot 191 of the second district of Quincy is either "C. F. A. Debrensmeyer" or "C. F. A. Dehrensmeyer," it is uncertain which, and there was no error in refusing to count it for appellant.

Upon ballot 267 of Payson precinct, the printed name of Kreitz is erased, and the name thereunder written is "F. A. behrn." It was evidently written by an illiterate person, and the ticket itself sufficiently shows why the residue of the name does not appear thereon. We have no doubt the letters "behrn" were intended as a contraction for "Behrensmeyer," and that the court properly counted the vote for him. (Clark v. Robinson, 88 Ill. 508.) For like reasons it was not error to hold that ballot 219 of the fifth district of Quincy, where the name of Kreitz was erased and the word "Behrens" written on the margin, was a vote for appellant.

Kreitz was erased upon ballots 86 and 92 of the first district of Quincy, and the name of appellant substituted. The fact his name was written in two places upon each ticket, in a cramped and contracted form, on a line with the erasure,

and in a more legible shape thereunder, did not invalidate the ballots in respect to the office of treasurer. There was upon each a designation of but one person for the office indicated. The statute in regard to double ballots should receive reasonable interpretation, and there is no just ground for saying that said ballots, respectively, were either votes for two different persons or were attempts to vote twice for the same person. The votes were properly counted for appellant.

In ballots 152 and 177 of the second district of Quincy the printed name of appellee was erased, and the name of appellant written, in pencil, in each, over the title of office. They should be counted for appellant. The circumstance, that upon one of them the written name slightly touches in one place the title of office, is wholly unimportant, as it is manifest that no cancellation of such title was intended.

In ballot 128 of the sixth district of Quincy there is a very plain pencil mark through the title of office; but the name of appellee is stricken out and the name of appellant written in, and there are other indications upon the ticket that it was intended as a vote for appellant for the office of treasurer. We are inclined to the view that upon its face it should have been counted for appellant, or that, in any event, the proffered testimony of the voter that the erasure of the title was accidental, should have been received.

In ballot 164 of the same district the name of Kreitz, in print, is erased, and the word "Benhmyer" is written in pencil into and across the title of office. "Bennmyer" is shown to have been one of the prevalent pronunciations of appellant's name. The written name was evidently not intended to cancel the printed title of office. In our opinion the case differs from that where the name of one candidate is written on and across the name of his opponent. In the latter case the presumption naturally arises, that by so writing the name the intention of the voter was by one and the same act to erase

the name of one and insert the name of another candidate. We think the vote was properly counted below for appellant.

So, also, ballot 216 of the seventh district of Quincy should be held to be a vote for appellant. There the name of Kreitz is erased, and the name "C. F. A. Berhensmeyer" written partly over the title of office.

In ballot 144 of the eighth district of Quincy the name of appellee in print is erased, and the name "Chas. Behrnsyer" interlined. This vote should be given to appellant.

We think there was no error in the action of the court in refusing to count ballot 16 of the eleventh district of Quincy for appellant. The name of Kreitz was erased, and the letters substituted therefor are of such ambiguous and doubtful character that it would be mere guesswork to say they were a contraction for any one of the numerous names by which Behrensmeyer was called.

Upon careful examination of certain supposed Kreitz ballots for treasurer, our conclusions are that the names appearing thereon for said office are as follows: Upon ballot 50 of Columbus precinct the name "John B. Keitz," upon ballot 58 of the same precinct the name "J. B. Kereitz," upon ballot 85 of Lima precinct the name "Krietez" or "Kritez," upon ballot 201 of Mendon precinct the name "Jon B. Kretts," upon ballot 87 of Richfield precinct the name "J. B. Kereitz," upon ballot 160 of the first Quincy district the name "John B. Krits," and on ballot 165 of the same district the name of "J. B. Kreits," (although there are some indistinct and superfluous marks connected with the first initial,) upon ballot 18 of the second district of Quincy the name "J. Critts," upon ballot 5 of the fourth district the name "Jhon Krits," and upon ballot 50 of the same district "J. B. Kritz," and there is no cancellation of the title of office upon either ballot, upon ballot 20 of the fifth Quincy district the name "Krites," upon ballot 3 of the eighth Quincy district either the name "J. B. Criets" or "J. B. Crietz," it is uncertain which, and upon ballot 108 of the same district the

name "J. Kreitz." We think the thirteen ballots last above mentioned should clearly be counted for appellee.

In ballot 205 of Ellington precinct the name of John B. Kreitz is written through the name of appellant in print, and said ballot should be counted for appellee.

Ballot 113 of Richfield precinct, claimed by appellee, was very properly held by the trial court to be a blank for the office of treasurer.

Upon ballot 208 of the first district of Quincy the name of appellant was erased and "Kri," in pencil, written to the right of it, and reaching to the edge of the ticket. *Clark* v. *Robinson,* above cited, justifies the action of the court in counting it as a vote for appellee.

Ballot 21 of the seventh district of Quincy contains two names for the office of treasurer, and should not be counted.

Ballot 107 of the tenth district of Quincy is plainly a vote for Kreitz, for the office of treasurer, and there was no error in refusing to hear the proffered oral testimony. We also think that ballot 253 of the same district should be counted for appellee.

Upon ballot 116 of the fifteenth district of Quincy the printed name of "John B. Kreitz" was erased, and the name "John M. Kreitz," in pencil, substituted. It appears that appellee has a brother named John M. Kreitz, who is commonly known as Mat Kreitz, living in the county, but who was not a candidate for any office at that election. When the cause was before us on a former hearing, we held that the middle letter was no part of the name, and that the vote was evidently intended and properly counted for John B. Kreitz. At the last trial appellant offered to show by the voter of the ballot that he erased the printed name and inserted in lieu thereof the name in pencil, and that he intended thereby to vote for John M. Kreitz, whom he knew. Although John M. Kreitz was not a candidate, yet it was entirely competent for a voter who so desired, to cast a ballot for him. *Prima facie* the vote was

for John B. Kreitz, who was a candidate for the designated office. While, ordinarily, a middle initial letter is not to be regarded as a substantial part of the name, yet sometimes, when a question of identity is raised, such initial letter becomes material. Here, when it was shown that there were two men, one named John B. Kreitz and the other John M. Kreitz, and that "John B. Kreitz" had been erased and "John M. Kreitz" written in its place, a case of latent ambiguity was presented. If no further testimony had been introduced or offered, the presumption of fact, from the circumstance that one was and the other was not a candidate, would have been that the vote was intended for "John B. Kreitz;" but there being a latent ambiguity, oral testimony was admissible to explain it,—and this, notwithstanding the fact that without oral testimony the ballot was *prima facie* for John B. Kreitz. It was therefore error to refuse such testimony. However, as it is not necessary, in order to determine this controversy, to ascertain whether said ballot was really for appellee or not, it is not required that the case should be remanded for the purpose of giving appellant the benefit of the proffered evidence.

Upon a careful examination of the ballots we are satisfied that 187 of Columbus and 317 of the ninth district of Quincy should be counted for appellee, as evidently his name is not erased upon either of them. We find, however, that upon 106 of the first named precinct and 118 of Honey Creek his name is erased, and find that said last mentioned ballots should be regarded as blanks in respect to the office of treasurer. We further find, that in ballot 189 of the eleventh district of Quincy the name of appellant is erased and the name "Krittz" or "Krettz" inserted, and that it should be counted for appellee. In ballot 194 of the same district the name of Kreitz in print is erased, the name of appellant written thereunder and also erased, and then the name of John B. Kreitz written in pencil partially over the title of office. We think the fair conclusion from the appearance of the ballot is, that the voter did not

intend to erase the title of office, and also that he intended to and did vote for appellee for treasurer, and that the ballot should be so counted. The writing and pencil marks upon ballot 119 of the seventh district of Quincy are exceedingly dim and obscure, but we are inclined to the opinion the name of appellant is erased and the name of Kreitz inserted. As we read ballot 245 of the twelfth district, it designates two names for treasurer, and it was therefore properly held by the county court to be a blank for that office.

We are of opinion that ballot 48 of Burton precinct, ballots 57, 145 and 159 of Richfield precinct, ballot 15 of Fall Creek precinct, and ballot 297 of the twelfth district of Quincy, do not either of them indicate an erasure of the title of office, and think that the four ballots first mentioned should be counted for Kreitz and the two latter for Behrensmeyer.

In respect to ballot 272 of Mendon, and ballot 259 of the twelfth district of Quincy, we think the court was justified, under the evidence, in finding they were double ballots, and in excluding them from the count.

The county court found and decreed "that one unnumbered ballot was cast for said John B. Kreitz in the thirteenth district of Quincy, and the number of ballots in that district exceeding the number of names on each of the poll-lists by one, said ballot is not counted for either party; that two unnumbered ballots were cast for said John B. Kreitz at the sixteenth district of Quincy, and the number of ballots there cast exceeding the number of names on each poll-list by one, only one of said unnumbered ballots is counted for said Kreitz, and the other not counted for either party." We are of opinion these findings and conclusions are supported and justified by the poll-books and other evidence appearing in the record. The statute requires that where the ballots found in the box exceed the number of names entered on each of the poll-lists, then the election judges shall reject the ballots, if any be found, upon which no number is marked. While it will primarily

be presumed that the election judges performed their duty, yet if it affirmatively appears that the ballots were in excess of the names found on each of· the poll-lists, and that there were unnumbered ballots to the number of such excess, then the mere fact such judges failed to reject or destroy the unnumbered ballots so in excess, but counted and returned them along with the valid votes of the election, will not preclude the court, in case of a contest, from carrying into effect the mandate of the statute. The statute requires three separate poll-lists to be kept, and where they all three agree in respect to the number of votes cast, they afford the highest and best evidence in that regard, and the statute evidently contemplates that they shall control in that matter, and the number of ballots in the ballot-box be made to conform to the poll-lists.

It has been expressly held in numerous cases, that if a man votes twice at an election where he is only entitled to vote once, then both votes must be rejected, and this, irrespective of the question whether such acts were done intentionally, ignorantly or by mistake. Eugene Miller went to the polls of the ninth district of Quincy and handed a ballot, upon which was the name of appellant for treasurer, to one of the judges of election, who received and numbered it and deposited it in the ballot-box. It was thereupon ascertained that his name was not on the register of voters, and further, that his proper place of voting was in the eleventh and not in the ninth district. His name was not placed upon the poll-books of the ninth district, and under an arrangement made between him and the judge who received and deposited his ballot, his vote was kept out of the count made at the close of the polls. Later in the day Miller voted for appellant in the eleventh district, where his name appears upon the poll-books. At the hearing, the county court declared both of said ballots to be· illegal, and refused to count either of them for appellant. It would seem that by handing his ballot to one of the judges, · and having it numbered and put into the box, Miller had done

all that he could do in the premises, and that the act of voting was complete. We find no error in the action of the court.

In respect to thirteen voters the question arises whether they were residents of the State, and for the required length of time preceding the election. It is much easier to state, in general terms, the rules of law that are applicable to the matter of residence, than it is to make application of such rules to the varying circumstances of particular cases. To discuss in an intelligible form the evidence found in the record relating to the legal qualifications of the numerous voters found in this and in other subdivisions into which the cases of the various contested ballots naturally arrange themselves, would extend this opinion beyond all reasonable proportions, and would accomplish no good or useful purpose. The questions involved in such discussions would be mainly evidentiary. We have carefully read and considered the testimony bearing upon the matter of the legality of the ballot of each of the voters, and will, in the main, content ourselves with merely announcing our conclusions in regard thereto.

The county court properly held that the impeaching evidence in regard to Joshua Havens, who voted ballot 234 in Mendon precinct, for Behrensmeyer, was insufficient to overcome the presumption of legality arising from the fact that he voted.

There was no error in the rulings of the court that Louis Kruse of Ellington, William Ferguson of Gilmer, Thomas Kelly of the fifth district of Quincy, William Hilden of the seventh district of Quincy, and G. Grinocker of the thirteenth district of Quincy, voted illegally for appellant, and in excluding their ballots from the count. In respect to the admissibility in evidence of the declarations of voters for the purpose of showing they were not qualified to vote, there is considerable conflict in the authorities; but we understand the rule in this State to be, that if such declarations are made subsequent to the election they are inadmissible, but that if made at or

prior to the election they are competent testimony,—and this, even though they do not accompany any act. *Beardstown* v. *Virginia*, 81 Ill..542; *Kreitz* v. *Behrensmeyer*, 125 id. 141.

In our opinion, however, the evidence, considered as a whole, does not justify the conclusion that Louis Steffin was not a legal voter in Ellington precinct at the time of the election. The weight of the evidence seems to show that on or about the 15th day of October, 1885, he moved back, bringing his wife and family with him, from the State of Missouri, where he had been for two years or more cultivating a rented farm, and that such removal was made with the intention of making his home at the house occupied by his father in Ellington. The facts that his lease in Missouri had not expired, that he left considerable property there which he did not dispose of until in January following, and that some of his household goods were not moved over to Illinois until February, are not of controlling importance. To a very considerable extent the loose statements made by him to the impeaching witnesses are not irreconcilable with the theory he came to Illinois in October, 1885, with the purpose of remaining here. Our conclusion is that the ballot of Steffin should be counted as a valid vote for appellant.

There was no error in counting for appellee the ballots of William Childers in Melrose, of Joseph Kennedy and Thomas Kennedy in the third district of Quincy, of William Dehm in the ninth district, and Peter Pinkleman in the sixteenth district. The evidence against each of them is insufficient to rebut the presumption that the voter was a legal voter.

Cameron Koontz was assailed by appellant as an illegal voter, but his ballot was held by the trial court to be valid. He was an unmarried man, and ran as engineer on a railroad train between Hannibal and Quincy. His train usually started from Quincy at five o'clock P. M. of each day of the week, for Hannibal, about twenty miles distant, and returned to Quincy the next morning. He usually took his meals at a boarding

house in Quincy, and had washing done there. It appears, however, that he had a well furnished room over a drug-store in Hannibal, Missouri, and roomed and slept there, and claimed Hannibal as his home. A man is not entitled to vote, at any one time, at either of two places that he shall elect. Upon consideration of all the evidence, we are of opinion it shows he had no "permanent abode," within the meaning of our statute, at Quincy, and that he regarded Hannibal as his residence and domicile. It follows thas his vote for appellee should be rejected as invalid.

We think the evidence is sufficiently clear that James Rogers and J. J. Fagan, both of whom voted in the sixth district of Quincy, were transient persons, who had no residence in Adams county of ninety days preceding the election, and hold that there was no error in excluding their ballots.

In respect to twenty-one voters the question arises whether they were legal voters in the voting districts in which they respectively cast their ballots. We have considered the evidence relating to each and all of them, and are not prepared to hold that there was any error in the judgment of the trial court in regard to them. John Fincke, Sr., and T. A. Melvin, cast valid ballots for Behrensmeyer. Oliver Demoss, Henry Coady, Fred Verring, H. C. Burgdorff and Mike Cassan cast valid ballots for Kreitz, and the evidence to impeach the vote of Thomas Krasus was insufficient to overcome the presumption in favor of its validity. He voted for Kreitz. Isaac Voorhes, Henry Epping, William Phauschmidt, James Roberts, John Tyler, Albert Moore, Henry T. Williams, Wirt Scheiner, Henry Heeb, W. Wittaker, August Burmeyer, George Buchner and Fred Strenckmeyer were not qualified voters in the precincts and districts in which they respectively voted, and their ballots are properly excluded from the count.

One Louis Brinkman voted for appellant in Burton precinct, and the trial court properly refused to count his ballot. He was alien born, and did not obtain naturalization papers until

40—135 ILL.

after the election.   He was two and a half years old when he came to the United States with his father, and the fact that the father died a year or two after he came, and when the son was three or four years of age, excludes any presumption that the father was ever naturalized.

There was no error in counting the vote of Edward Corey for appellant.   Said Corey was born an alien, but was brought to this country when a minor, by his father.   It seems that the certificate of naturalization which issued to the father included the names of two persons,—the father and one James Kay.   This was informal, but did not invalidate the certificate.

The ballots of the three brothers, William, Herman and August Tansman, were properly counted for appellant.   They were born in Germany, and of German parents, and had never been naturalized.   Their father's original name was Henry Lickman, but when he married, in Germany, he took the name of Tansman, from his wife's estate.   The family came to this country in 1847, and the father died about 1873.   Among his deeds and valuable papers was found a certificate of naturalization, admitting to citizenship "Henry Dunsmeyer," and dated March 31, 1858.   There was on file in the office of the clerk of the circuit court of Adams county, from which court the final certificate issued, a declaration of intention, in the body of which the name of the declarant was written "Henry Dunsmeyer," but the signature to which was "Heinrich Tansman," in German letters, and which signature was shown to be in the handwriting of the father.   There was also testimony to the effect that by some persons the elder Tansman was called "Dunsmeyer."   A misnomer in a naturalization paper does not vitiate the certificate.   The parol evidence introduced did not contradict or impeach the record,—it merely showed the identity of the "Henry Dunsmeyer" named therein with the "Henry Tansman" to whom they were issued and delivered.   (*Fisher* v. *Milmine*, 94 Ill. 328; *Beardstown* v. *Virginia*, 81 *id.* 541.)   Parties to a record or judgment can usually be

ascertained by an inspection of the record; but such is not always the case. In *Pond* v. *Ennis et al.* 69 Ill. 341, it was held, that where a party to a record is incorrectly named, he may be connected with the judgment by proper averments, and that when such averments are made and proved, the party intended to be named in the judgment is affected as though he were properly named therein. We think that the evidence in this case sufficiently identifies the father of the three voters here in question as the party to whom the certificate of naturalization was actually granted and delivered.

Christ Eckert, Herman Pohlman, Morris Hanrihan, William Bunte and George Doerle each voted for appellant, and they were held by the trial court to be illegal voters. These voters all stand upon the same footing, and we think that the ruling of the court in respect to them was erroneous. They were all of them foreign born, and came to the United States while under age, with their respective parents. The contestee merely proved by these several parties the above facts, and that they had never gone before a court and procured naturalization papers. The court refused, on cross-examination, to allow the contestant to ask of these witnesses whether or not they knew the fact of their respective fathers having been naturalized before they were, severally, twenty-one years of age.

It is stated in McCrary on Elections, (2d ed.) sec. 294, to be well settled, that where one who is alien born has voted at an election, the law presumes that he has been naturalized until the contrary is shown,—that to presume otherwise would be to presume the commission of a crime; but that since the presumption of the law involves the necessity of proving a negative, the difficulty of so doing requires that slight proof ought to be sufficient to shift the burden. Like doctrine was announced in *Beardstown* v. *Virginia*, 76 Ill. 34, and *Same* v. *Same*, 81 id. 541, and the rule there held seems to be, that such proof as renders the existence of the negative probable is sufficient to change the burden to the other party. In the first

decision it was said: "We are of opinion that the statement here in evidence of these persons, that they had never been naturalized and that they did not know that their fathers had been, constituted *prima facie* evidence that such persons had not been naturalized and so entitled to vote, and that the court was warranted in so inferring from such evidence. Had their fathers been naturalized while they were minors, it is probable they would have known the fact." The implication from this language is, that in the case of persons of foreign birth who came to this country during their minority with their fathers, mere proof that they have not themselves been naturalized is not sufficient, of itself, to overcome the presumption arising from the fact of their having voted. The presumption is that the voters were naturalized. This naturalization may have been either through naturalization certificates procured by themselves, or through the naturalization of their fathers during their minority. There is no presumption it was by one means rather than or to the exclusion of the other. Proof that their fathers were never naturalized would not tend to show that papers had not been issued to themselves, or rebut the presumption they had been so issued. And so, also, proof that they themselves had not procured certificates would not tend to prove that their fathers never became citizens, or exclude the presumption that such was the case. To rebut the presumption of legality and shift the burden of proof, some testimony is required, though it may be but slight, that is responsive to and tends to negative both modes of naturalization.

We also think that the court erred in holding that Joseph Sheridan was a legal voter. He was born in Ireland in 1850, and has never taken out naturalization papers. In 1851 his father, Edward Sheridan, came to America and was naturalized, and died in 1862. In 1863—a year after his father's death—the son came to this country. Section 2172 of the Revised Statutes of the United States provides: "The children of persons who have been duly naturalized under any

law of the United States, * * * being under twenty-one years of age at the time of the naturalization of their parents, shall, if dwelling in the United States, be considered as citizens thereof." The qualification, "if dwelling in the United States," plainly has reference to "the time of the naturalization,"—in other words, in order that the naturalization of the parent should be effective to invest his child with citizenship, two conditions must exist at the time of such naturalization: the child must be under twenty-one years of age, and must also dwell in the United States.

Charles Speckart is shown by the evidence to have been an illegal voter, and the court was right in refusing to count his ballot for appellant.

The vote of William Wemhoener was valid, and was properly credited to appellant.

H. Schumacher also cast a valid vote for appellant. He stands in the same shoes with Christ Eckert and four others, whose case has already been considered, except that he testifies, in behalf of appellee, that he has taken out naturalization papers since the election. Such act is in the nature of an admission that he was not a qualified voter at the time of the election, and upon the authority of *Kreitz* v. *Behrensmeyer*, 125 Ill. 141, and *Beardstown* v. *Virginia*, 81 id. 542, was not competent testimony as against appellant.

The father of E. F. Behrensmeyer procured his final papers after the son arrived at the age of twenty-one, and the ballot was properly excluded by the court.

Herman Terstriep was an unnaturalized alien, and his vote was properly rejected on that account.

Appellee is entitled to the vote of Louis Groneman, during whose minority final papers were issued to his father. The fact that the father had, upon his marriage in Germany, assumed the name of the estate of his wife, Gans, and that the papers were taken out in that name, did not invalidate them.

There was no error in excluding the vote of Harre Johnsen. He was born in Denmark, and his applying for and receiving naturalization papers in 1867 was an admission of his alien parentage, and it having been made prior to the election, was competent testimony. The papers then issued to him were void, as, by his own showing, they were not applied for in open court, or issued upon the order of any court, but made out and delivered by a county clerk, upon the payment to him of $1.50 therefor. McCrary on Elections, (2d ed.) sec. 56. Thomas Harrison stands in the same category. According to his own sworn statement he never went to any court or court house for the purpose of being naturalized, but procured his papers from a justice of the peace, and has since lost them.

The court refused to count for appellant the vote cast by Robert Wallace. It appears from the testimony of said Wallace that he was born in Ireland, came to this country when twelve years old, and before he reached the age of twenty-one years procured naturalization papers from a court in Cincinnati, but which papers have since been destroyed by fire. We would like to arrive at the conclusion which was reached by the trial court, and thereby prevent Wallace or any one else from profiting by the fraud which he perpetrated upon the court which made the order admitting him to citizenship, but we can not consistently do so in the view which we take of the law. The rule is, that where a certificate of naturalization is granted by a court of competent jurisdiction, evidence is not admissible to show that it was improperly granted, or was obtained by false and perjured testimony. (6 Am. and Eng. Ency. of Law, p. 435, and authorities cited; Abbott's Trial Evidence, sec. 52.) This court has decided to the same effect. (*The People* v. *McGowan*, 77 Ill. 644.) It was there said: "In proceedings of naturalization, matters are submitted to the decision of the court, and the presumption will be indulged the court heard evidence, was satisfied the applicant had complied with the law, and its findings must be held conclusive as

to all facts recited in the record." The authorities cited by appellee (McCrary on Elections, sec. 21, etc.,) are not in conflict with this view, but the distinction is, that parol evidence is admissible to show that naturalization papers were fraudulently issued or procured if the naturalization was in fact the act of the clerk, alone, etc., and not the judgment of a court of competent jurisdiction. We think that appellant is entitled to the vote of Wallace.

Thomas Quinlan claimed the right to vote through the marriage of his mother with one Linnehan, a naturalized citizen; but unfortunately for his claim, the evidence shows that said Linnehan was not naturalized until a year and a half after Quinlan reached his majority.

There was no error in throwing out the ballot of Gustav Grev. He was born in Germany, and neither he nor his father ever received papers of citizenship.

The case of Frank Woermann is like that of Christ Eckert and others, and his vote should have been credited to appellant.

August Bausmann was born in Germany, and was brought to this country when one year old, in 1854, by his mother. The mother was a free white woman, and was married to one Kersick in 1854, and Kersick obtained naturalization papers bearing date March 27, 1858, which were produced and identified at the trial. This naturalized said Bausmann, under the provisions of the act of Congress of February 10, 1855. (See *Kreitz* v. *Behrensmeyer, supra,* at p. 197.) His ballot is counted in favor of appellant.

The vote of John Waack was properly held legal, and credited to appellant. The certificate of naturalization produced by him was made out in the name of George Waack, but the evidence satisfactorily establishes that it was issued and delivered to him, and he should not be disfranchised on account of the clerical error of the clerk.

Joseph Zeigler was born in Switzerland, and voted upon his first papers. Even if there could otherwise have been any

presumption that his parents were citizens of the United States, such presumption would have been effectually rebutted by the fact that he had procured first papers. There was no error in excluding his ballot.

Jacob Seibers and Charles Doerle were born in foreign countries, came to the United States after they were twenty-one years of age, and never took out naturalization papers. The trial court refused to count their votes. It is urged that this action of the court was erroneous. Authorities are cited for the purpose of showing that alienage may be proved by proving birth in a foreign country, and from parents not citizens of this country. Undoubtedly it may be so shown, and such evidence is plenary proof of alienage; but when a party assumes to prove that a third person is not a citizen of this State, the burden of proving a negative is necessarily imposed upon him, and, as we have already seen, the doctrine in such case is, that he is not required to produce full and conclusive proof, and is only bound to introduce such proof as renders the existence of the negative probable, and that when that is done it is deemed sufficient to shift the burden of proof to the opposite party. In *Jackson* v. *Wright*, 4 Johns. *75, where the evidence was that one Thomas Nelson had emigrated from Ireland to the United States, it was held that it must be presumed that he was born in Ireland and was an alien. Here the evidence is, that Seibers was born in Prussia and Doerle in Baden, that they came to this country after they reached manhood, and have never procured naturalization papers. The court will take judicial notice that their names are foreign to this country and to the English language. While it is possible that they may have been born at their respective places of birth of parents who were American citizens, yet the strong probabilities are that such was not the case. And if the fact be that each or either of them was of American parentage, such fact was peculiarly within the knowledge of the said voters, respectively, and it must be presumed that each, hav-

ing an interest in sustaining his own vote, would have stated such fact while upon the witness stand. In other words, the probabilities, under the evidence, are all in favor of the proposition that these voters were alien born, and, as already stated, the law only requires slight proof. In our opinion there was no error in excluding the votes of .Seibers and of Doerle.

We think that what we thus hold in regard to the presumption arising from the fact of birth in a foreign land, is not inconsistent with what we have herein held in respect to the presumption that arises out of the fact that an alien father emigrates to this country and brings his alien infant child with him, and continues to reside here with his family. The general rule is, that one born in a foreign land is alien born, and the case of one who is born in a foreign land and yet born within the allegiance of the United States is an exceptional case, and forms, as it were, an exception to the general rule. On the other hand, aliens who emigrated many years ago from foreign countries and brought their families and infant children with them, and have continued to reside here, have, as a general rule, under our liberal naturalization laws, become citizens of this country. Of course, there is no legal presumption that such is the case that would obviate the necessity for the production of naturalization papers, when the right of such emigrant to the privileges of citizenship is challenged. Such emigrant is presumed to know where and in what court the record of his naturalization is. But the presumption of such knowledge on the part of the child of such emigrant, who was brought here in infancy, is very much weaker. There is always a record kept of naturalization proceedings, and a voter who has himself obtained naturalization papers must presumably know where the record of his naturalization is; but there are thousands of courts in the United States which have power to grant naturalization, and in view of this and of the migratory habits of our people, we think that in the case of a voter who came here while a minor, with his father, the evidence should at

least raise a probability that such father was never naturalized, in order to overcome the presumption that the vote cast was legal. Assuming that the child who has exercised the right of voting, derived through the naturalization of the father, is bound, when such right is properly challenged, to produce the record of the judgment admitting the father to citizenship, yet it would seem but reasonable and just, before such production should be required, that the challenger should overcome the strong presumption that the voter had voted legally and had not committed a crime, by the introduction of at least some vague proof tending to show that the father had not been naturalized.

There is strenuous insistence that the court erroneously credited the vote of William H. Pyne to appellant. He was born in England of English parents, in 1818, came to America in 1844, lived at Lancaster, Pennsylvania, from that time until the fall of 1847, when he broke up housekeeping, sold all that he had except the wearing apparel of himself and family, and started west with his wife and daughter. He did this with the intention of making his home at Quincy, Illinois, where a brother of his had been living for several years. He crossed the mountains by stage, and went from Pittsburg to St. Louis by boat, reaching the latter place about Christmas, 1847. His wife had an uncle living there, and the family visited with him for some five weeks. He left his wife and child there, and started by boat for Quincy. The boat was stopped by ice at Alton, and from thence he made his way, in part by conveyance and in part on foot, to Quincy, reaching there the last week in February, 1848. He remained with his brother until about the middle of April, looked at some real estate with reference to buying a home, but made no purchase, and also consulted with a lawyer (Mr. Jonas) in regard to his right to vote under the constitution of 1848, which was then about to go into effect, and as a result of such consultation he never made any application for papers of citizenship. He then returned to St. Louis, for the purpose of bringing his wife

and daughter, who were still visiting with the uncle, to Quincy. He was detained at St. Louis for some time by sickness, but returned to Quincy with his family in May, and went to housekeeping in a house which his brother had rented for him, and has resided in Adams county ever since.

Under the constitution of 1870, every person who was an elector in this State on the first day of April in the year 1848, and has certain other prescribed qualifications, is entitled to vote. The constitution of 1848 (sec. 1, art. 6,) provided, that "every white male inhabitant of the age of twenty-one years, who may be a resident of the State at the time of the adoption of this constitution, shall have the right of voting." The constitution of 1848 was adopted by the people on March 6, 1848, and went in force April 1, 1848. Was Pyne an inhabitant and resident of the State on March 6, 1848?

A man must have a domicile somewhere, and a domicile once gained remains until a new one is acquired, and a man may acquire a domicile or residence if he be personally present in a place and elect that as his home. These are all propositions which were announced when this case was before us on the former hearing. But a man can not have two or more "permanent abodes" or residences, in the sense of the constitution and the statute, in different jurisdictions, at one and the same time. In the case at bar, Pyne abandoned his residence in Lancaster, and the mere fact that he and his family made a temporary visit of several weeks or even months with his wife's uncle in St. Louis, did not gain for either him or them a domicile or home in that city. But when he reached Quincy, with the intention of living there permanently, and, being personally present there, elected that as his home, then, to all intents and purposes, he became a resident and inhabitant of that city, and he being the head of the family, and having his domicile there, it also became the domicile of his wife and daughter, who were temporarily visiting a relative in another State. It is to be noted, however, that the result

might be otherwise if he had left his family in the old home in Lancaster, and, having gone to Quincy, had bought or rented a house there with the intention of removing his family into it and adopting it as his home. In this latter event, the existence of the actual home in Lancaster would be inconsistent with the present existence of a home in Quincy. But in the case before us the Lancaster domicile had been abandoned, and there was nothing to prevent him, while personally present in Quincy, from adopting that place as the present and permanent residence of himself and family. Herein this case differs from other cases found in the record, and to which it is compared by counsel for appellee, where voters bought or rented houses in voting precincts other than those in which they actually lived more than thirty days prior to the election, and with the intent of going there to live, but did not actually move their families until within less than thirty days before election. And herein, also, the case differs from *Williams* v. *Whiting*, 11 Mass. 424, and other cases cited, and wherein it was held that what was done by the head of the family did not operate as a change of residence until the family were removed. We think there was no error in the ruling of the court in respect to Pyne.

Richard Sims claimed the right to vote under the provisions of the constitutions of 1870 and 1848. The evidence satisfactorily shows that he is alien born and was never naturalized, and that he was under twenty-one years of age at the time of the adoption of the constitution of 1848. Under the decision of this court made in *Beardstown* v. *Virginia*, 76 Ill. 34, the trial court could not do otherwise than exclude his vote.

It appears from the testimony of Daniel Sullivan that he was born in Ireland, and came to America and to this State in 1846, during his minority and without his parents, and has never taken out any papers of citizenship from any court. He states that he was born on October 2, 1827, and that that is his correct birthday, and that he has always regarded Oc-

tober 2, 1827, as his birthday; that his father has been dead for forty years, and he got information of his birthday from his brother. He states in one place that "neither father nor brother is now living," and on cross-examination, "my brother came to this country before I did; suppose he lives in New York." We think that under the rule as stated in *Beardstown* v. *Virginia, supra,* and in section 294 of McCrary on Elections, this sufficiently negatives the fact of Sullivan's being of the requisite age of twenty-one years at the time of the adoption of the constitution of 1848, and shifts the burden of proof in respect to the date of birth. In the section designated it is said, that if the voter claims that aliens had the right to vote, or perhaps if, when he is called as a witness, he refuses to answer whether he has been naturalized or not, or to say when or where or in what court he was naturalized, the presumption in favor of the validity of his vote is so far overcome as to require the party seeking to sustain his vote, to produce affirmative evidence. We think that the ballot of Sullivan should be excluded from the count.

In respect to David Guyott we think that the evidence does not sufficiently overcome the presumption in favor of the legality of his vote, and that the probabilities are that he was a resident of this State on March 6, 1848. His ballot should be credited to Kreitz.

The testimony in regard to Barney Epping is very voluminous, and does not seem to require special discussion. Suffice it to say that we have carefully examined it all, and are unable to come to the conclusion therefrom that the decision of the trial court that he was an illegal voter, is erroneous.

We will assume, at least for the purposes of this case, that a lunatic or distracted person is not a qualified voter, and that his vote may be rejected upon a contest. (McCrary on Elections, sec. 50; Cooley's Const. Lim. 599; *Clark* v. *Robinson,* 88 Ill. 498.) The court refused to admit in evidence a record of the county court of Adams county, made more than twelve

years prior to the election, and showing a finding by a jury, and an adjudication, that John Weisenberger was a lunatic, and the appointment of a conservator for him. In *Eddy* v. *The People*, 15 Ill. 386, and long prior to the adoption of any statute requiring notice to the supposed insane person in a proceeding *de lunatico inquirendo*, it was held by this court that reasonable notice to such person was necessary, and even in a case when the supposed insane person actually appeared by counsel and examined the witnesses. Section 2, chapter 86, of the Revised Statutes, provides that in a proceeding to ascertain whether a person be lunatic or distracted, "summons shall be issued and served upon the person for whom a conservator is sought to be appointed, in the same manner as summons is issued and served in cases in chancery." Most important rights, both personal and pecuniary, of the person against whom such application is made, are involved in the investigation, and the word "shall," in the statute, must be regarded as mandatory. In this case the record shows only nine days' service of summons before the date of hearing and judgment, and that the service was by reading. Under the statute, service was required to be made by delivering a copy of the summons, and at least ten days before the hearing. (Rev. Stat. chap. 22, sec. 11.) There was no waiver of irregularities by Weisenberger on account of his personal appearance in the proceeding, for an insane man is incompetent to waive any right, and the appellant here can not afford to admit that he was not insane. The finding and adjudication, and appointment of a conservator, were void for want of jurisdiction, and the court properly excluded them as evidence. If the voter was, as a matter of fact, insane at the time of the election, testimony to establish such fact should have been introduced; but as it was not, the presumption must be that he was of sound mind. His vote was properly counted for appellee.

We are unable to appreciate the logic of the argument, which, from the fact that Reineke was illegally drafted into

the army during the war of the Rebellion, and sent a substitute, deduces the conclusion that he was a legal voter. The court properly excluded his ballot.

There was no error in the rulings of the court in respect to L. H. Harrison, or in counting his vote for appellant.

The poll-lists of the second district of Quincy show that 225 votes were there polled. At the recount only 224 ballots were found in the package of ballots, and the missing ballot was number 96. The poll-lists show that W. P. Moore voted ballot number 96, and Moore testifies that he voted; that one of the judges put his ballot in the box, and that it was for John B. Kreitz for the office of county treasurer. We think that there was no error in counting the vote for Kreitz.

It was shown by the evidence of F. S. Inman that his son, F. C. Inman, was under twenty-one years of age at the time of the election, and there was no error in excluding the ballot of the latter.

In the ninth district of Quincy two ballots were numbered 63 on their backs. They were both for Behrensmeyer. There was no ballot in the box with the number 64. The evidence shows that one of the judges of election made several mistakes in numbering. We think that there was no error in counting both ballots for appellant.

We find no material error in respect to the matter of the exclusion by the court of the vote cast for appellant by Sebastian Winters.

The remaining questions are in respect to the four persons, each named Henry Dix, who voted in the tenth district of Quincy, and voted, respectively, the four ballots numbered 9, 34, 61 and 173. Ballot 9 was a blank in respect to the office of treasurer. Ballot 34 was for Kreitz, and ballot 61 was for Behrensmeyer. Ballot 173 is missing, and the ballots are one short of the names on the poll-lists. These two latter circumstances are accounted for by the fact, testified to by all three of the judges of election, that they found, when counting the

ballots on the night of the election, a double ballot in the box, which they then and there destroyed, they acting under the mistaken idea that their duty as judges required them so to do. One Henry Dix is distinguished as "the whitewasher," and another Henry Dix is known as "Cotton Dix." It is manifest, from the evidence, that Henry Dix "the whitewasher" is an alien, and that his vote was illegal. The finding of the court below was, that Henry Dix, known as "the whitewasher," voted illegally, and that he voted ballot 173, and that ballot 173 was a double ballot, and was destroyed by the judges. A careful consideration of the evidence convinces us that the trial court was wrong in its conclusion that the man known as "the whitewasher" voted ballot 173. It would be useless to discuss. in detail the conflicting testimony bearing upon the point. It is sufficient to say, that in our opinion the correct solution of the matter is, that Henry Dix known as "Cotton Dix" voted the double ballot 173, and that Henry Dix known as "the whitewasher" voted ballot 61, and that said ballot 61 is therefore illegal. The result is that ballots 9, 61 and 173 should not be counted for either candidate, and that ballot 34 should be counted for Kreitz.

The result of that which we have held herein is, that Behrensmeyer, the appellant, received 4577 legal votes at the election, and that Kreitz, the appellee, even if the ballot cast for John M. Kreitz (above considered) be counted for him, received only 4569 legal votes, and that Behrensmeyer having received a plurality of at least eight votes is entitled to the office.

The trial court erred in deciding that appellee was duly elected, and in awarding him the certificate of election, and in dismissing the petition of appellant at his costs, and for these errors the judgment and decree of that court is reversed. Appellant is declared duly elected to the office of county treasurer of Adams county, and it is so ordered and declared.

*Judgment reversed.*